Michael T. BYRNE, Movant-Appellant,

Debra Manov, Plaintiff-Appellant,

v.

Camran NEZHAT, M.D., Farr Nezhat, M.D., et. al., Defendants-Appellees.

No. 99-12623.

United States Court of Appeals,

Eleventh Circuit.

Aug. 14, 2001.

Appeals from the United States District Court for the Northern District of Georgia. (No. 96-00096-CV-GET-1), G. Ernest Tidwell, Judge.

Before TJOFLAT, BIRCH and DUBINA, Circuit Judges.

TJOFLAT, Circuit Judge:

Stripped to its essentials, this is a simple medical malpractice case. It was brought, however, as a multi-count RICO prosecution. Suspecting that the claims in the complaint lacked factual bases, the district court took an unusual step and granted the defendants leave to conduct discovery for the purpose of determining whether plaintiff's counsel had violated Rule 11 of the Federal Rules of Civil Procedure. The discovery was to determine whether plaintiff's counsel had conducted an "inquiry reasonable under the circumstances" into the factual support for the claims presented in the complaint.[1] After the court took this

---

[1]Fed.R.Civ.P. 11 states:

> (b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
>
> > (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> >
> > (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.
>
> (c) Sanctions. If, after notice and a reasonable opportunity to respond, the court

step, the plaintiff moved the court to recuse pursuant to 28 U.S.C. § 455.[2]  The court denied the motion.

During the Rule 11 discovery, the court dismissed the plaintiff's claims against one of the defendants for failure to state a claim upon which relief could be granted.  After the discovery was completed, the defendants moved the court to sanction the plaintiff and one of her attorneys pursuant to Rule 11, 28 U.S.C. § 1927,[3] and the court's inherent power.  They contended that, with the exception of the plaintiff's medical malpractice claim, none of the claims presented had a factual basis and the claims had been brought in bad faith for the sole purpose of harassment.  The court agreed.  In two orders issued sixteen months apart, the court dismissed the remainder of plaintiff's claims, except for the malpractice claim.  In addition, it required the plaintiff and her attorney to pay the attorneys' fees and costs incurred in defending the dismissed claims.  Two months after the first order issued, the plaintiff renewed her motion for recusal;  as before, the court denied the motion.

These consolidated appeals came after the district court issued its second sanctions order.  Appellants—plaintiff and one of her attorneys—challenge the denials of the plaintiff's motions for recusal, the dismissal of the plaintiff's claims (except the malpractice claim), and the imposition of monetary sanctions in the form of attorneys' fees and costs.

We organize this opinion as follows.  In Part I, we recite the events that led the defendants to seek Rule 11 sanctions early in the case.  In Part II, we address the plaintiff's argument that the district court should have recused.  In Part III, we consider the propriety of the court's dismissal of all but the plaintiff's malpractice claim as well as the court's imposition of monetary sanctions against the plaintiff and her attorney under Rule 11, 28 U.S.C. § 1927, and the court's inherent power.  Finally, in Part IV, we discuss the tools a district court should use in dealing with the types of pleadings filed by the attorneys in this case.

---

determines that subdivision (b) has been violated, the court may, subject to conditions stated below, impose an appropriate sanction upon attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

[2]The plaintiff's motion did not specify the subsection of section 455 on which it was based.  Only two were conceivably applicable, subsections (a) and (b)(1).  Subsection (a) states:  "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Subsection (b) states:  "He shall also disqualify himself in the following circumstances:  (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]"  *See infra* note 40.

[3]28 U.S.C. § 1927 states:  [a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

I.

In September 1992, Debbie Manov ("Manov"), a New Jersey resident suffering from endometriosis,[4] traveled to the Atlanta Center for Fertility and Endocrinology ("the Center")[5] for corrective laparoscopic surgery. Drs. Farr Nezhat and Camran Nezhat, two of the Center's specialists,[6] performed the surgery at Northside Hospital ("Northside"). Prior to the surgery, the doctors told Manov that her appendix might be infected and that, if infected, it should be removed. She agreed. During the surgery, the doctors determined that the appendix was infected and removed it. Following the surgery, Manov developed an infection, which necessitated her readmission to Northside. Drs. Nezhat treated the infection with antibiotics, which Manov claims contributed to her loss of hearing.[7]

In August 1994, Manov, represented by Atlanta attorney Edward Kellogg, filed a medical malpractice suit in the Superior Court of Fulton County, Georgia. Named as defendants were Drs. Farr and Camran Nezhat and the Center. The alleged malpractice was the removal of a healthy appendix (during the laparoscopic procedure) which, in turn, caused an infection requiring further hospitalization.

Shortly after filing suit, Manov consulted James Neal ("Neal"), a Pennsylvania lawyer practicing out of his residence in Ohio. At the time, Neal and Michael Mixson ("Mixson"), an attorney from Monroe, Georgia, were prosecuting two other medical malpractice cases in Atlanta, both filed in December 1993, on behalf of Mary Mullen ("Mullen"). The first lawsuit, brought against Drs. Farr and Camran Nezhat, Dr. Earl Pennington, the Center, and Northside, was pending in the Fulton County Superior Court.[8] The second suit,

---

[4]Endometriosis is "a condition in which tissue containing typical endometrial granular and stromal elements occurs aberrantly in various locations in the pelvic cavity or some other area of the body." Dorland's Illustrated Medical Dictionary (28th ed.1994). According to Merriam Webster's Medical Dictionary 205 (1995), endometriosis is defined as "the presence and growth of functioning endometrial tissue in places other than the uterus that often results in severe pain and infertility."

[5]The Center is located in Atlanta, Georgia.

[6]Throughout this opinion, we refer to the Nezhat defendants and the Center defendant jointly in that (1) the Nezhats are employed by the Center, and (2) all allegations against the Center are based solely on their conduct.

[7]According to Manov, her appendix was not infected; its removal therefore constituted negligence on the part of the Drs. Nezhat. She claims that their negligence also caused the post-operative infection. Finally, she claims that in performing the appendectomy, the doctors only removed part of her appendix; this caused feces to leak into her abdomen and pelvic cavity which in turn led to an E. coli bacteria infection.

[8]On February 11, 1994, the defendants moved the superior court to disqualify Neal from representing the plaintiff because he had not been granted leave to represent her *pro hac vice.* The court denied the

brought against the members of Northside's board of directors in their individual capacities, was pending in the United States District Court for the Northern District of Georgia.[9]  Because Mullen's cases are of central importance to the instant case, we relay the history of her cases as follows.

In her superior court complaint, Mullen alleged that on December 18, 1991, the Drs. Nezhat and Pennington negligently performed a bowel resection procedure to alleviate rectal endometriosis.  Mullen alleged that the procedure was experimental, caused severe physical complications, and that it was performed without her informed consent.  Mullen's complaint contained seven counts, each proceeding on a tort law theory predicated on the bowel resection procedure.[10]  In her district court complaint, framed in one count, Mullen alleged that members of Northside's board were negligent in permitting the doctors to perform an experimental bowel resection without the patient's informed consent.[11]

---

defendants' motion and granted Neal *pro hac vice* status on July 12, 1995.  *See infra* note 9.

[9]Neal petitioned the district court for admission to appear *pro hac vice* on January 18, 1994.  The record does not indicate whether the court granted his petition at that time.  What the record does reveal is that on February 11, 1994, the defendants moved to disqualify Neal from appearing as Mullen's co-counsel, and that on May 1, 1994, the court denied the motion.  *Mullen v. Spanier,* No. 1:93-CV-2882-RHH (N.D.Ga.) (May 11, 1994).  The defendants renewed their motion to disqualify Neal on September 27, 1995.  According to an order the district court issued in Manov's case on February 23, 1998, Neal withdrew from Mullen's case on October 27, 1995, before the court could rule on the defendants' renewed motion to disqualify.  *Manov v. Nezhat et al.,* No. 1:96-CV-0096-GET (N.D.Ga.) (February 23, 1998).

[10]The counts were as follows:  Count I, the negligence described in the above text;  Count II, surgery performed without the patient's informed consent;  Count III, battery committed because the surgery was performed without the patient's informed consent;  Count IV, negligence committed by Northside when it granted the defendant physicians surgical privileges;  Count V, fraud on the part of the physicians when they induced Mullen to undergo the bowel resection by misrepresenting or omitting material facts;  Count VI, the "tort of outrage";  Count VII, punitive damages.  Counts II and III were duplicative, both alleging an unauthorized touching, i.e., a battery.  Count VII did not allege a separate cause of action;  rather, it merely sought punitive damages in the previous counts.

[11]In its January 23, 1997 order granting the defendants' renewed motion for summary judgment, the district court described the medical services rendered to Mullen by Drs. Farr and Camran Nezhat, Dr. Pennington, the Center, and Northside as follows:

> Mullen, a California resident, was referred to Dr. Camran Nezhat and Dr. Farr Nezhat of Atlanta for treatment of pelvic pain.  In connection with his treatment of [Mullen], in December 1988, Dr. Camran Nezhat performed video laserscopy upon [Mullen] for treatment of endometriosis.  [Mullen] subsequently returned to Atlanta in December 1991 for further treatment by Drs. Nezhat.  She was admitted to Northside ... and underwent the surgery that is the basis of this action on December 18, 1991.  Drs. Nezhat, apparently with the assistance of one of the named Defendants [Dr. Pennington], performed a bowel resection upon [Mullen].  Shortly after the surgery, [Mullen's] rectum and bowel prolapsed while she was using the bathroom.  [Mullen] contends that since that time, she has had continuous medical problems as a direct result of this surgery.

*Mullen v. Spanier et al.,* No. 1:93-CV-2882-CC (N.D.Ga.) (January 23, 1997).

By the time Manov spoke to Neal, he had amended the allegations in Mullen's state court suit to add two causes of action, for a total of nine.[12]  Counts VIII and IX, brought against the Drs. Nezhat and the Center,[13] sought compensatory and punitive damages for violations of the Georgia RICO[14] statute, O.C.G.A. § 16-14-4.  Count VIII alleged that the defendants were operating a "criminal enterprise" and engaging in "a pattern of racketeering activity," and that such racketeering activity had caused Mullen injury.  The "acts of racketeering" were, among others, that the Drs. Nezhat (1) made false statements in medical journal articles; (2) failed to obtain valid consent for surgical procedures from Mullen and other patients at the Center, thereby committing aggravated battery on the patients;  (3) improperly billed insurance companies for experimental surgeries;  and (4) improperly used experimental drugs.  *Mullen v. Nezhat,* 223 Ga.App. 278, 477 S.E.2d 417, 419 (1996).  Count IX alleged aggravated battery, and federal mail and wire fraud as acts of racketeering. Count IX asserted that the Drs. Nezhat committed aggravated battery by failing to obtain " 'valid informed consent ... by fraudulently misrepresenting the true nature of their experimental surgery, [and] by repetitively performing non-indicated unnecessary surgery' on Mullen and other patients, thereby 'deliberately and maliciously causing bodily harm' amounting to aggravated battery."  The mail and wire fraud allegedly occurred when the defendants "engage[ed] in experimental and non-consensual medical treatment by implanting Estradiol pellets into 'hundreds if not thousands of women without their knowledge that this hormonal implant was not approved.' "  *Id.*

Apparently, Manov was impressed with the manner in which Neal was handling Mullen's cases, so she decided that Neal should take over her lawsuit against Drs. Nezhat and the Center.  Neal said he would take the case, but would need to associate local counsel.  Manov agreed.  Neal thereafter searched the records of the Fulton County Superior Court for the names of other attorneys who had sued the Nezhats or the Center. He found one, Michael T. Byrne ("Byrne"), one of the appellants now before us.[15]  In the spring of 1995,

---

[12]The information regarding Mullen's claims is taken from the decision of the Georgia Court of Appeals in *Mullen v. Nezhat,* 223 Ga.App. 278, 477 S.E.2d 417, 419 (1996), which affirmed the partial summary judgment entered against Mullen by the Fulton County Superior Court.

[13]Dr. Pennington and Northside, the other defendants in the lawsuit, were not sued in Count VIII. We cannot determine from the record whether Pennington or Northside were named in Count IX.

[14]RICO is an acronym for Racketeer Influenced and Corrupt Organizations.

[15]Byrne had litigated an employment discrimination case against the Nezhats on behalf of a former Center employee.

Byrne appeared as Manov's counsel in the state court suit, and Edward Kellogg withdrew.

Unbeknownst to Manov, the continuation of Neal's *pro hac vice* status in Mullen's state and federal court cases was being challenged on the grounds that he had violated the courts' discovery rules and the Code of Professional Responsibility by engaging in malicious and harassing conduct against the Nezhats and the Center. These challenges began in February 1994, when the defendants in both of Mullen's cases moved the courts to revoke Neal's *pro hac vice* status. In each case, the court denied the motion, but nonetheless condemned Neal's behavior. The district court's May 11, 1994 order stated that, although Neal's "conduct did not conclusively violate the Code of Professional Responsibility .... [his] actions bordered on conduct unbecoming an officer of the Court."[16] The superior court's order, issued July 11, 1994, was more explicit. It stated that "Neal's communication with various counsel for Defendants borders on unprofessional, scurrilous, and distasteful conduct.... [His] conduct has come as close to the line as one could possibly come to violating the Georgia Code of Professional Responsibility."[17] He communicated with defense counsel "in a cavalier and 'half-cocked' manner in an effort to bully the Defendants into a quick and favorable settlement."[18] As part of his bullying tactics, he "threatened criminal prosecution to gain a civil advantage;[19]

---

[16]*Mullen v. Spanier,* No. 1:93-CV-2882-RHH (N.D.Ga.) (May 11, 1994).

[17]*Mullen v. Nezhat,* No. E-23339 (Ga.Sup.Ct) (July 11, 1994).

[18]*Id.*

[19]*Id.* During his litigation of Mullen's claims, Neal informed counsel for the Nezhats that they may be subject to criminal prosecution. In a February 1, 1994 letter to their lawyers, Neal represented that he "served as an agency special assistant to a U.S. Attorney for a number of years ... know[s] attorneys within the Government and know[s] ... that medical fraud cases are *very high* on the Government's prosecution list due to health care reform concerns" (emphasis in original). Neal's letter implied that the Nezhats, during the course of their medical practice, had engaged in criminal activity which could lead to a federal RICO prosecution and the confiscation of their business assets. The chances of such a prosecution, Neal opined, would be increased if members of the press learned of the allegations he had made on Mullen's behalf. After informing counsel of the risk their clients would run if they persisted in contesting Mullen's claims, Neal's letter reminded counsel that they had "an awesome responsibility. If you make a wrong decision, then things could quickly move out of all of our control." Neal closed his letter with the following warning: "If you make the mistake of handling this case like any other, then all hell may break loose, to both our detriments. If you choose to ignore the risks involved—if you choose to simply accept the denials of your clients, then we will go forward. If we do go forward, then we will spare no expense or effort in proving our case and in making it the largest case that we possibly can. It is on your shoulders."

From the Spring of 1994 to June 1996, Neal sent letters to federal prosecutors, the Federal Bureau of Investigation, and the Food and Drug Administration. Each letter accused the Nezhats of fraud and other criminal conduct. For example, in a May 1, 1994 letter to the United States Attorney for the Northern District of Georgia, Neal wrote: "I am writing concerning two Iranian surgeons (brothers/Naturalized Citizens), who I have become convinced are dangerous

threatened to use the media as a sounding board in order to gain a civil advantage;  ... engaged in activities to subvert justice;  ... [and] threatened to be the causing agent to send some of the Defendants [i.e., the Nezhats] back to their home country."[20]  Notwithstanding such conduct, the court permitted Neal to continue his representation of the plaintiff because "a party should be represented by an attorney of [her] choice whenever possible."[21]

According to the defendants in Mullen's cases, Neal failed to heed the courts' admonitions.  They therefore renewed their motions to revoke Neal's *pro hac vice* status and to have him disqualified as co-counsel in Mullen's cases.[22]  On August 16, 1995, the superior court barred Neal from further participation in the case.  In its order, a part of which we quote in the margin, the court found that "Neal's continued unethical behavior, ... despite the earlier admonitions, has tipped the balance in favor of ensuring ethical conduct on the part of lawyers over the right of the Plaintiff to have her chosen counsel."[23]  The superior court

---

and amoral men, capable of and perhaps even inclined to harm Ms. Stacy Mullen, my client." Neal represented that the Nezhats had "committed a series of criminal maimings by deception." The May 1 letter was the first of several Neal directed to that United States Attorney.  Neal's letters to the FBI contained similar allegations of criminal wrongdoing.  Among other things, Neal told the FBI that the Nezhats were preparing to move their assets "off shore."  As indicated in the text *infra,* the Fulton County Superior Court eventually barred Neal from participating in Mullen's case against the Nezhats and the Center, and shortly thereafter, he voluntarily withdrew from representing Mullen in her district court case against the directors of Northside. Notwithstanding his withdrawal from Mullen's cases, Neal's letters to the United States Attorney and the FBI continued unabated.  In fact, Neal's letter-writing campaign against the Nezhats continued into the prosecution of the instant case on behalf of Manov.

[20]*Id.*

[21]*Id.*

[22]The defendants renewed their motion in the Georgia Superior court on April 10, 1995 and in the district court on September 27, 1995.

[23]The court balanced a party's right to counsel of her choice against the court's, and the public's, interest in "maintaining the integrity of the judicial process."  Referring to its order of July 11, 1994, admonishing Neal about his conduct, the court described Neal's "current conduct" in these words:

Neal's "informal discovery procedures" and his continued requests for information from Georgia Baptist Hospital and Northside Hospital concerning allegations that Dr. Camran Nezhat engaged in inappropriate sexual conduct with his patients.  The "informal" discovery procedures complained of include requests by [Neal] for information concerning Dr. Nezhat from Stanford University Hospital in Palo Alto, California; Millard Fillmore Hospital in Buffalo, New York;  and St. Joseph's Hospital in Atlanta, Georgia.  The information requested by Mr. Neal was contained in various hospitals' credentialing files.  The information was not released by the hospitals as the information is either privileged or would not be released without written authorization by Dr. Nezhat. *See Parker v. St. Clare's Hospital,* 553 N.Y.S.2d 533, 159 A.D.2d 919 (1990) and *Matchett v. Superior Court,* 40 Cal.App.3d 623, 115 Cal. Rptr. 317 (1974).

[Neal] justifies his actions by claiming that he only requested information concerning application forms filled out by Dr. Nezhat for the hospitals. This is simply semantics. It is clear that Plaintiff's counsel was attempting to subvert the system and hopefully discover information to which he may not otherwise have been entitled. Mr. Neal, as a former Hospital Counsel, understands the privileges that accompany medical credential files. However, he attempted to undermine this privilege. No where in his letters to these institutions did he identify himself as an attorney involved in litigation against Dr. Nezhat.

Further evidence that [Neal] knew his conduct was deceitful comes from the fact that the same day he sent the letters to the hospitals requesting information about Dr. Nezhat, he sent a letter to Defendant's counsel, Mr. Green, requesting that Dr. Nezhat sign a broad authorization for the release of his credential files at the various institutions at which he practiced. [Neal] obviously anticipated that Dr. Nezhat would not sign such a request and therefore, before even receiving a response to the request for authorization. Mr. Neal was already requesting the same information from those same hospitals, knowing of their privileged nature. This violates Georgia Code of Professional Responsibility DR 1-102(A)(4): "A lawyer shall not engage in professional conduct involving dishonesty, fraud, deceit, or misrepresentation." [Neal] was deceitful and dishonest in his attempts to gain privileged and protected information in Dr. Nezhat's credential files.

The second activity complained of by the Defendants is [Neal's] repeated attempts to discover information concerning Dr. Nezhat's alleged sexual misconduct with his patients. [Neal] based those allegations on a telephone conversation with Mr. Michael Frick, general counsel for Georgia Baptist. In that conversation Mr. Frick claimed there were rumors that Dr. Nezhat engaged in sexual improprieties with his patients. In an attempt to clear up any misunderstanding, Mr. Frick has checked the docket of the Superior Court House of Fulton County and the records at Georgia Baptist Hospital. He determined there was nothing on the dockets or in the hospital records concerning any improprieties by Dr. Nezhat. Mr. Frick also examined the file of Dr. Nezhat kept at Georgia Baptist on Dr. Nezhat and found no complaints against Dr. Nezhat concerning sexual misconduct. Mr. Frick has subsequently filed an affidavit on this matter outlining the steps he took in the course of his investigation and concluded that he was mistaken in believing Dr. Nezhat was involved in sexual misconduct. Further, Georgia Baptist has responded to Plaintiff's request for Production of Documents indicating that there are no records at their hospital that support the allegations of sexual misconduct.

Despite the affidavit of Mr. Frick and the response of Georgia Baptist, [Neal] is undeterred. He has filed a Motion to Compel directed to Georgia Baptist for documents concerning any misconduct by Dr. Nezhat and has used the telephone conversation with Mr. Frick as the basis for Plaintiff's Motion to Compel in the United States District Court action against the Board of Directors at Northside Hospital.

[Neal] contends that he is justified in this course of action due to his firm belief in these allegations. He has stated that these allegations are supported by other people, but has provided no proof of such. Mr. Neal also claims that Mr. Frick is not credible due to his current position as Counsel for Georgia Baptist. Mr. Frick has filed an affidavit under oath and penalty of perjury stating that as a result of his investigations, Dr. Nezhat has not been involved in any sexual misconduct. Further, Georgia Baptist has stated it has no such records concerning this matter. [Neal's] continued attempts to gain this information in the face of such denials is a violation of Georgia Code of Professional Responsibility DR 7-102(A)(1): "(A) In representing his client, a lawyer shall not: (1) ... assert a position ... or take other actions on behalf of his client when he knows or it is obvious that such action would serve merely to harass or maliciously injure another." In

issued a second order on August 16, 1995 granting the defendants summary judgment on Mullen's RICO claims. Mullen, now represented solely by Mixson, appealed the judgment.[24]

The defendants in Mullen's district court case also sought Neal's disqualification. On September 27, 1995, they renewed their motion to revoke his *pro hac vice* status. Neal promptly withdrew from the case, thereby mooting defendants' motion.[25]

As Neal's privilege to represent Mullen in her state and federal court cases was coming to an end, Byrne, on July 13, 1995, voluntarily dismissed Manov's superior court lawsuit.[26] Six months later, on January 12, 1996, one day before the Georgia renewal statute would have barred refiling of Manov's case,[27] Byrne

---

this case it is obvious that there is no information concerning Dr. Nezhat's alleged sexual misconduct. The unrelenting fashion in which [Neal] has attempted to acquire this information is harassing and malicious.

It is well established that: "The rules of disqualification of an attorney will not be mechanically applied; rather we should look to the facts peculiar to each case in balancing the need to ensure ethical conduct on the part of lawyers appearing before the court and other special interests, which include the litigants right to freely chosen counsel." *Stoddard v. Board of Tax Assessors,* 173 Ga.App. 467, 326 S.E.2d 827 (1985). [Neal] has already received a stern warning from this Court concerning ethical violations, particularly conduct that could be viewed as malicious and harassing. [Neal] was walking on thin ice when admitted pro hac vice to practice in Georgia. Admission was explicitly conditional on Mr. Neal following the Code of Professional Responsibility to the letter. Mr. Neal's continued unethical behavior in this case, despite the earlier admonitions, has tipped the balance in favor of ensuring ethical conduct on the part of lawyers over the right of the Plaintiff to have her chosen counsel. Mr. Neal has left no option for this Court other than to disqualify him as Plaintiff's counsel.

*Mullen v. Nezhat,* No. E-23339 (Ga.Sup.Ct.) (August 16, 1995).

[24]The Georgia Court of Appeals affirmed the summary judgment on October 22, 1996, while the instant case was still pending. *See Mullen v. Nezhat,* 223 Ga.App. 278, 477 S.E.2d 417 (1996).

[25]*See supra* note 9. Neal was replaced by Edward T.M. Garland and Robin N. Loeb of Atlanta. On January 24, 1997, the district court granted the defendants summary judgment. Mullen appealed, and we affirmed. *See* 11th Cir. R. 36-1. *Mullen v. Spanier,* 131 F.3d 156 (11th Cir.1997) (unpublished table decision).

[26]While Byrne had filed an appearance as Manov's counsel of record, Mixson is the attorney who signed the voluntary dismissal. In a September 25, 2000 letter to this court, Mixson indicated that he only made a brief appearance on behalf of Manov in her state court case and did not become involved in her federal court case until after the district court's February 23, 1998 order sanctioning Byrne and Manov.

We note also that on April 10, 1995, the defendant renewed their motion to disqualify Neal in Mullen's superior court case. This motion was pending resolution when Byrne voluntarily dismissed Manov's superior court case.

[27]*See* O.C.G.A. § 9-2-61.

brought Manov's malpractice claim to the district court, filing the lawsuit now before us.[28] Although he was

Manov's lawyer, Neal neither signed the complaint nor sought leave to appear *pro hac vice*.[29] In addition to

Drs. Farr and Camran Nezhat and the Center, the complaint named as defendants Dr. Ceana Nezhat, Ali

Nezhat,[30] and Northside.

As noted above, Manov's state court complaint contained only one count: the medical malpractice

claim. The complaint Manov filed in the district court, however, which consisted of 78 pages and 299

paragraphs, contained eight additional counts. Its centerpiece was Manov's claims for damages under the

state and federal RICO statutes, O.C.G.A. § 16-14-6[31] and 18 U.S.C. § 1964(c),[32] Counts III and IX,

---

[28]Manov's case was initially assigned to Judge Charles A. Moye, Jr. According to the case's docket sheet, on January 18, 1996, Judge Moye entered an "ORDER transferring [the] case to another district judge on the regular rotation list." That same day, the district court clerk assigned the case to Judge G. Ernest Tidwell, who presided over the case until its conclusion. In this opinion, in referring to the district court, we refer to Judge Tidwell.

[29]In his deposition taken by the defendants pursuant to the district court's order permitting them to engage in Rule 11 discovery, Byrne testified that, even though both he and Neal were representing Manov, they purposely omitted Neal's name from Manov's complaint. Byrne explained that they did not want Neal to become an issue in Manov's case.

[30]Drs. Farr, Camran, and Ceana Nezhat and Ali Nezhat are brothers. The physicians are employed by the Center; Ali Nezhat is the Center's office manager.

[31]Section 16-14-6(c), "Available civil remedies," provides: "Any person who is injured by reason of any violation of Code Section 16-14-4 shall have a cause of action for three times the actual damages sustained and, where appropriate, punitive damages." Section 16-14-4, "Prohibited activities," provides:

> (a) It is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

> (b) It is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

> (c) It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section.

Neither Count III nor any other part of Manov's complaint cited the subsection(s) of section 16-14-4 the defendants allegedly violated.

[32]Section 1964(c) provides, in pertinent part, that:

> Any person injured in his business or property by reason of a violation of [18 U.S.C. §]1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Section 1962 contains four subsections, (a)-(d). Subsection (a) makes it a crime for anyone who

respectively. The allegations of the two RICO counts were essentially the same. According to Manov, each defendant was an "enterprise" which was conducted "through a pattern of racketeering activity."

Each count of the complaint incorporated by reference the allegations of each preceding count.[33] Count I, sounding in negligence, was brought against Northside for failing to monitor and investigate the Nezhats' practice of surgery at the hospital. Count II alleged medical malpractice on the part of Drs. Farr and Camran Nezhat. Count III sought recovery under the Georgia RICO statute against all of the defendants. Count IV alleged that Drs. Farr and Camran Nezhat committed battery by performing an appendectomy without Manov's consent. Count V alleged that Dr. Farr Nezhat fraudulently misrepresented that Manov's appendix might be infected and require removal. Count VI alleged that the manner in which Drs. Farr and Camran Nezhat, the Center, and Northside billed Manov and other patients for services rendered constituted "theft by deception." Count VII alleged that Drs. Farr and Camran Nezhat failed to obtain Manov's "informed consent" to perform an appendectomy. Count VIII sought punitive damages against all defendants.[34] Count IX alleged violations of the federal RICO statute by Drs. Farr, Camran, and Ceana Nezhat, Ali Nezhat, and the Center.

---

has derived income from "a pattern of racketeering activity ... in which such person has participated as a principal ... to use or invest, directly or indirectly, any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise ... engaged in ... interstate ... commerce." Subsection (b) imposes criminal liability on anyone, who "through a pattern of racketeering activity ... acquire[s] or maintain[s], directly or indirectly, any interest in or control of any enterprise ... engaged in ... interstate ... commerce." Subsection (c) makes it a crime for any person "employed by or associated with any enterprise engaged in ... interstate ... commerce ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Subsection (d) makes it a crime for anyone to conspire to violate the substantive offenses of sections 1962(a)-(c).

Neither Count IX nor any other part of Manov's complaint cited the subsection(s) of section 1962 the defendants allegedly violated.

[33]Each count explicitly referred to one or more named defendants. For example, the allegations appearing under the heading "Count V" focused on Dr. Farr Nezhat:

*Count V—Fraud*

*Defendant Farr Nezhat*

Because each count incorporated each preceding count, however, Count V actually sought recovery against the defendants who had been named in one or more of the preceding counts. In the Part III.B.2, we filter out the incorporated allegations that are obviously irrelevant to the theory of recovery stated in the title of the count.

[34]We note that a prayer for punitive damages is not an independent cause of action. Instead, certain causes of action, such as intentional torts, may provide for the recovery of punitive as well as compensatory damages.

The defendants answered Manov's complaint, asserting several affirmative defenses, including that the complaint failed to state a claim for relief.[35] On May 3, 1996, before any significant discovery had taken place, defense counsel wrote the district court asking leave to engage in Rule 11 discovery. They contended that Neal was Manov's lawyer; that he had ghost-written Manov's complaint; that Byrne had signed it merely in his capacity as local counsel and had not conducted the requisite pre-filing investigation of the facts underpinning the complaint's claims; that the complaint's RICO allegations were similar to those Neal had made in the Mullen cases,[36] and that the superior court had barred Neal from further participation in Mullen's case. Counsel attached to their letter a copy of the superior court's August 16, 1995 orders (removing Neal from the case and granting the defendants summary judgment on Mullen's RICO claims), and represented that Neal, through Byrne, was using Manov's case as a vehicle to continue his vendetta against the Nezhats. Counsel pointed out that Manov's case had begun as a simple, one-count medical malpractice case in the Fulton County Superior Court, but that after Neal entered the picture, it became a "blunderbuss" RICO prosecution aimed at extorting a quick settlement.

On June 5, 1996, the district court granted the defendants leave to conduct Rule 11 discovery.[37]

---

[35] After answering the complaint, Northside moved the court to dismiss Manov's claims against it pursuant to Fed.R.Civ.P. 12(b)(6). The motion was in effect a nullity since Northside had asserted in its answer as an affirmative defense that the complaint failed to state a claim for relief. Had Northside wished to file a Rule 12(b)(6) motion for failure to state a claim for relief, it should have done so before filing its answer containing the same defense. *See* Rule 12(b) ("[a] motion making any of these defenses shall be made before [answering the complaint].") Northside followed the same procedure after Manov filed an amended complaint. First, it answered the amended complaint and asserted the affirmative defense of failure to state a claim for relief; then, sometime later, it filed a motion which presented the same defense.

[36] For instance, both Mullen's state court complaint and Manov's complaint in the instant case alleged that the defendants violated the Georgia RICO statute. As incidents of racketeering activity, both complaints alleged that the Drs. Nezhat had committed medical journal fraud and had improperly prescribed experimental medications. Similarly, both complaints alleged that the Drs. Nezhat failed to obtain the plaintiff's informed consent to perform the surgery at issue. Based on the lack of such consent, the complaints alleged that the Drs. Nezhat committed battery when they operated on Mullen and Manov. Furthermore, both complaints contained allegations of sexual misconduct. Mullen's state court complaint, at paragraph 258, alleged that Camran Nezhat had exhibited a "propensity to violence against women." Manov's complaint in the instant case, at paragraph 158, alleged that "Camran Nezhat was represented by counsel relating to matters of sexual improprieties upon patients." Finally, in her district court case, Mullen moved the court for a protective order on the ground that the Drs. Nezhat were intimidating her witnesses. The district court denied the motion because there was no evidence to support it. This intimidation-of-witnesses claim was repled in Manov's complaint as an incident of racketeering activity.

[37] The defendants' intent to seek Rule 11 discovery was disclosed to Manov's counsel and the district court in the Joint Planning Report and Scheduling Order the parties filed with the court on April 26, 1996. On May 16, 1996, Byrne responded to defense counsels' May 3 letter, and defense counsel replied on May 23. In ordering Rule 11 discovery, the court explained that it was treating the May 3 letter as a

Three weeks later, on June 26, Manov moved the court to permit her to engage in Rule 11 discovery as well. The requested discovery related to Count I titled, "Negligence against Northside": specifically, the allegation in paragraph 158 stating that "Dr. [Camran] Nezhat has been represented by counsel relating to matters of sexual imposition upon patients,"[38] and Counts III and VIII, alleging violations of the Georgia and federal RICO statutes.

On June 28, Manov moved the court for leave to file an amended complaint. At this time, she also filed a "Motion for an Order Directing Defendant Ceana Nezhat to provide Sworn Testimony to this Court Within Three Days that He is a Bona Fide Physician."[39] On July 8, while the foregoing motions were

motion by the defendants for leave to conduct discovery limited to the question of whether Manov's complaint had been filed in violation of Rule 11. Although the court required such discovery to be completed within 45 days, it took 13 months to complete.

[38]The discovery Manov requested was in the form of interrogatories and requests for production of documents directed to the Center, Northside, and 19 hospitals and medical facilities. A proposed interrogatory to the 19 hospitals read as follows:

[Interrogatory No.] 5.

Have there been any incident reports or other documentation generated at your institution concerning Camran, Farr or Ceana Nezhat:

A. That have involved the *striking of nurses/physicians?*

B. That have involved operating outside specialty/surgical privileges?

C. That have involved *sexual contact with patients?*

D. That have involved any other incident?

(emphasis added). Proposed interrogatories nos. 36 and 37 asked Northside whether it received "any information from Georgia Baptist Hospital to the effect that Camran Nezhat has beaten a female physician in a stairwell at Georgia Baptist Hospital ... or concerning providing fee [sic] vaginal examinations to employees of Georgia Baptist or was making inappropriate comments to said individuals during vaginal examinations." Proposed interrogatory no. 50 asked Northside whether Camran Nezhat "was ever referred to as 'Hands On' Nezhat ... while he was a resident in Buffalo." In the Proposed Findings of Fact the defendants submitted to the court on July 10, 1997, in support of their motions for sanctions, the defendants represented that Camran Nezhat served his residency in Buffalo, New York "twenty years ago."

[39]As indicated in the text *infra,* the court granted Manov's motion for leave to amend her complaint. Manov's September 6, 1996 amended complaint alleged that Ceana Nezhat was not a medical doctor, in that he "has not been awarded a medical degree." That allegation appeared in Count IV, "Georgia RICO," as an act of racketeering, and in Count V, "Battery," as part of Manov's claim that the appendectomy the Nezhats performed constituted a battery. In Manov's June 19, 1996 motion for reconsideration of the court's June 5 order granting the defendants leave to conduct Rule 11 discovery, Byrne represented that he had a "reasonable belief" that Ceana Nezhat was not a physician. In Byrne's view, as he stated on deposition, (*see supra* note 37), every time Ceana Nezhat "touche[d] a woman in the practice and t[old] people he [wa]s a doctor, there [wa]s a lack of informed consent and that's a battery under Georgia law and that would be a felony."

pending, Manov moved the court to recuse, pursuant to 28 U.S.C. § 455(a), on the ground that one of its law clerks, Dan McDevitt ("McDevitt"), had been formerly employed by the law firm representing the Nezhats and the Center.[40]  On July 9, after entertaining the arguments of counsel, the district court ruled on these motions.  The court granted Manov leave to amend her complaint, but denied her other motions.

---

Byrne based his belief that Ceana Nezhat was not a medical doctor on the following information obtained by Neal:  On January 23, 1996, Neal wrote the Swiss Embassy in Tehran to inquire about Ceana Nezhat's medical training.  Because the United States did not have diplomatic relations with Iran, Neal directed his correspondence through the Swiss Embassy.  In his letter, he stated his belief that Ceana had not graduated from the University of Tehran Medical School in 1981 and asked the Swiss Embassy to confirm this belief. Neal received four documents in response.  The first was a letter handwritten in Persian.  The second, a translation of the letter, indicated "non-attendance" at the medical school by Ceana Nezhat after the first semester of 1978-79.  The third document was a letter from Dr. G. Pourmand, Vice-Chancellor for Research and International Relations at Tehran University of Medical Sciences and Health Services, which, purporting to rely on information received from another part of the university, stated that Ceana Nezhat did not complete the 1978/79 period "due to no reference," and was not awarded a doctoral degree in medicine.  The fourth document, a Swiss Embassy transmittal accompanying the first three, interpreted them only as stating that "Mr. Nezhat *has no record* of completing his medical course at the said University" (emphasis in original).

Apparently, there is a dispute about whether the language translation contained in the second document was accurate.  The defendants contend—based on an unverified search and in the face of the ambiguity created by the fourth document, which indicated that there was simply no record of Ceana Nezhat completing his degree—that it was irresponsible for Byrne to allege in Manov's amended complaint that Ceana Nezhat was not a medical doctor.  The lack of a record, they submit, does not parlay into the lack of a degree;  rather, in light of the overwhelming evidence to the contrary, the allegation appears baseless.  Ceana Nezhat holds a license to practice medicine and surgery from the State of Georgia.  Furthermore, the Educational Commission for Foreign Medical Graduates ("ECFMG"), the lawfully designated agency for investigating and determining whether foreign medical graduates can be certified to practice medicine in the United States, certified that Ceana Nezhat satisfied all of its requirements and successfully passed its examinations.  The defendants assert that, in certifying Ceana Nezhat, the ECFMG determined that he had a medical degree.  Finally, Byrne ignored Ceana Nezhat's graduate work in medicine at the Nassau County Medical Center, a major affiliate of the State University of New York at Stoney Brook, and at the University of Illinois.

In addition to using Ceana Nezhat's purported lack of a medical degree as a basis for Manov's claims in Count IV and Count V of her amended complaint, the defendants contended that, in an effort to extort a settlement, Byrne and Neal informed the media and the medical community that Ceana Nezhat was not a physician.  Northside's counsel represented to the district court that Manov's attorneys had sent a copy of their motion questioning Ceana Nezhat's credentials to a reporter, Linda Carroll, because, hours after the motion was filed, Carroll called Northside's counsel to ask "How can you allow persons not a doctor to be practicing there?"  In his deposition (taken as part of the Rule 11 discovery), Byrne admitted speaking with Carroll a "dozen or less" times about the Nezhats.

[40] As indicated in note 2 *supra,* Manov's motion did not specify the subsection of 28 U.S.C. § 455 on which it was based.  Only two were conceivably applicable, subsections (a) and (b)(1).  In none of her submissions to the court regarding recusal pursuant to section 455 did Manov cite subsection (b)(1) or any of the language thereof.  Rather, all of her submissions cited the language of subsection (a), specifically the words "impartiality might reasonably be questioned."  Moreover, in her second motion for recusal, filed April 23, 1998, Manov used the term, section "455(a)."  Hence, we treat Manov's motions as having sought the court's recusal pursuant to section 455(a).

Two months later, on September 6, Byrne filed an amended complaint.[41]  The amended complaint contained the same claims as Manov's original complaint with the exception of Count VI (theft by deception), Count VII (the claim that Drs. Farr and Camran Nezhat had not obtained Manov's informed consent prior to surgery), and Count IX (the federal RICO claim), which had been deleted.[42]  On September 23, 1996, the defendants answered the complaint;  their answers once again included the affirmative defense of failure to state a claim for relief.

Four days later, on September 27, Byrne, apparently anticipating the defendants' motions for Rule 11 sanctions, filed a memorandum in support of Manov's claims.[43]  On October 15, Northside moved the court to dismiss Manov's claims against it in Counts III and IV for failure to state a claim for relief.[44]  On November 5, Byrne filed a memorandum in response to Northside's motion, and on November 11, Byrne and Neal filed a memorandum supplementing Byrne's September 27 memorandum in support of Manov's amended complaint.[45]  The court granted Northside's motion to dismiss on December 11, 1996.[46]  The court dismissed

---

[41]Byrne styled the pleading "First Amended Complaint."  We refer to it as the amended complaint.

[42]The amended complaint consisted of 32 pages and 126 paragraphs.  It rearranged and restated in part the remaining six counts of the original complaint, so that Count I of the original complaint became Count III, Count II became Count I, Count III became Count IV, Count IV became Count V, Count V became Count II, and Count VIII became Count VI.

        Thus, the amended complaint read as follows:  Count I alleging medical malpractice by the Center and Drs. Farr and Camran Nezhat;  Count II alleging fraud by the Center and Drs. Farr and Camran Nezhat;  Count III alleging negligence by Northside;  Count IV alleging violations of Georgia RICO by all defendants;  Count V alleging battery by Drs. Camran, Farr, and Ceana Nezhat;  Count VI, "Punitive Damages [Against] All Defendants."

[43]The memorandum contained 45 pages and 92 exhibits, which, Byrne represented, constituted evidentiary support for Manov's several claims.

[44]Northside's motion merely replicated its affirmative defense of failure to state a claim for relief and therefore was a nullity.  *See* note 35 *supra.*

[45]The memorandum contained 146 pages.

[46]As we have noted, *see* notes 35 and 44 *supra,* Northside's motion to dismiss for failure to state a claim for relief was a nullity because, prior to filing its motion, Northside had answered the amended complaint and had included therein the affirmative defense of failure to state a claim for relief.  If Northside wished the court to pass on the sufficiency of that affirmative defense, it should have moved the district court for a judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).  We therefore treat the court as having considered Northside's motion to dismiss as a motion filed pursuant to Rule 12(c).  As indicated in the following text, in dismissing Count III, as time barred, the court considered a fact not alleged in the complaint, to-wit:  that Manov's malpractice complaint in the Fulton County Superior Court did not name Northside as a defendant.  The court had to consider this fact in order to conclude that the statute of limitations on the Count III negligence claim had run and that the claim was not saved by the

Count III on the ground that it was time barred, and the claim against Northside in Count IV on the ground that it failed to allege a violation of the Georgia RICO statute by the hospital.[47]  Following this ruling, the defendants, including Northside, continued their Rule 11 discovery.

On July 8, 1997, Northside moved the district court to sanction Manov and Byrne pursuant to Rule 11, 28 U.S.C. § 1927, and the court's inherent power.  Two days later, the Center and Nezhat defendants filed a similar motion.  On July 14, Manov moved the court to defer ruling on the defendants' motions until she could conduct "Rule 11 defense discovery."  Manov's motion did not describe the defensive discovery she wished to conduct.  The court denied Manov's motion on July 30.  On July 31, Manov supplemented her motion with a request that she be granted leave to obtain (1) records pertaining to the Drs. Nezhats' medical credentials, (2) reports relating to appendectomies performed by the Nezhats during 1992, and (3) reports relating to bowel resection procedures performed on sixteen patients.  Manov contended that these records and reports would demonstrate that Count IV, alleging violations of the Georgia RICO statute, had evidentiary support.  On August 6, 1997, the court denied Manov's motion.

On October 15, 1997, Neal, still lacking *pro hac vice* status but nonetheless appearing for Manov, moved the district court to impose sanctions against two of the Nezhats' lawyers, Henry D. Green and David F. Walbert, pursuant to the court's inherent power.  Neal's motion represented that these attorneys had made "25 misrepresentations/material concealments in a May 3, 1996 letter to the Court, which in turn resulted in

---

Georgia renewal statute.  Because the court considered a matter outside the four corners of the complaint, it should have treated Northside's motion as one for summary judgment and disposed of it as provided in Fed.R.Civ.P. 56.  *See* Rule 12(c) ("the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

[47]Stripped to its essentials, Count III charged Northside with negligent supervision of the Drs. Nezhat;  Count IV alleged that Northside (and the other defendants) had violated the Georgia RICO statute.  In dismissing Count III as time barred, the court considered matters beyond the four corners of the amended complaint and, thus, in effect, granted Northside summary judgment.  *See* Fed.R.Civ.P. 12(c).  *See* note 46 *supra*.

> The court dismissed Count IV on the ground that, under the Georgia RICO statute, a corporation is not amenable to suit;  rather, the plaintiff must sue the corporation's board of directors.  Manov failed to do that.  The court therefore concluded that Northside should be dropped from Count IV.

> The court did not enter final judgment for Northside until September 1, 1999, when, pursuant to court order, "judgment [was] entered for the defendants against plaintiff on all claims and the action [was] dismissed."

unilateral [Rule 11] discovery."[48]

On February 23, 1998, the court granted the defendants' motions for sanctions and denied Neal's motion for sanctions. Drawing on its authority under Fed.R.Civ.P. 11, 28 U.S.C. § 1927, and its inherent power, the court found that Byrne's "pre-filing investigation [did] not support the filing of a RICO claim against the Nezhats ... [and that] the claim against the Nezhats was brought without a reasonable factual basis." The court held Manov and Byrne liable for the defendants' attorneys' fees and costs, the amounts to be fixed in a subsequent order.[49] The court also dismissed Manov's amended complaint with prejudice—save for the medical malpractice claim against the Nezhats and the Center—on the ground that Manov had failed to establish a cognizable claim for relief. The court did so even though the legal sufficiency of Manov's (dismissed) claims was not formally before it.[50] Finally, on its own initiative, the court ordered Neal "not to participate in any form or fashion" in the prosecution of Manov's malpractice claim against the Nezhats and the Center.[51]

On April 23, 1998, Manov again moved the district court to recuse pursuant to 28 U.S.C. § 455(a).

---

[48]An additional ground for the imposition of sanctions, according to Neal, was the attorneys' use of "German phrases and commands at the deposition of a Jewish physician."

[49]The court considered imposing sanctions against Neal (even though the defendants' had not pressed the court to sanction Neal). In its February 23 order, the court chose not to sanction Neal for the following reasons:

> Although Neal has clearly had an involvement in this matter, Neal is not the attorney of record. Further, Neal has not been deposed about the extent of his involvement and the extent of his pre-filing investigation. However, due to the grossly intemperate nature of Neal's allegations, there is a strong suspicion that Neal's assumptions and suspicions are not reasonable or factually supportable. However, Neal has not been deposed and has not had the opportunity to support and defend his position relative to sanctions. Unlike Byrne, the discovery to determine the extent of Neal's investigation in this matter has been limited. Thus, defendants have failed to make a sufficient showing to convince this court that under the record as it now stands, Neal is subject to sanctions.

[50]The defendants did not move the district court to dismiss Manov's complaint or amended complaint (or any of the claims therein) pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief. Instead, they included in their answers the affirmative defense of failure to state a claim for relief. The sufficiency of the affirmative defense was not before the court because (1) Manov had not moved to strike it, and (2) the court had not informed the parties that it would consider the sufficiency of the defense on its own initiative in the context of ruling on the parties' respective motions for sanctions.

[51]The record does not indicate whether the court directed that Neal be served a copy of its order, or whether Neal otherwise received actual notice that the order had been entered. After entry of the February 23 sanctions order, the defendants took Manov's deposition regarding her medical malpractice claim. During this deposition, she stated that she did not know that the court had banned Neal from further participation in the case.

In addition to the circumstance of McDevitt's former employment with the lawfirm representing the Nezhats and the Center (the basis for Manov's first motion to recuse), Manov contended that the court's rulings demonstrated an apparent bias against her. Thus, the court's "impartiality might reasonably be questioned." The district court denied the motion on June 1, 1998.

After the district court dismissed Manov's claims against Northside under Rule 12(c), as part of the February 23, 1998 sanctions order, struck all of Manov's claims against the Nezhats and the Center except the medical malpractice claim, the Nezhats and the Center commenced discovery on the merits of that claim. When Manov refused to comply with a court order requiring her to provide the Nezhats and the Center with the basis for the opinion of her medical expert, they moved on April 21, 1998 to strike the expert from Manov's list of witnesses.[52] The court granted the motion on May 26, 1998. This left Manov without a medical expert to support her malpractice claim. Since Georgia law requires that a plaintiff suing for medical malpractice produce expert testimony that the physician defendant deviated from the pertinent standard of care, Manov had no case. Accordingly, on July 21, 1998, she moved the court to dismiss her medical malpractice claim with prejudice. The court granted the motion.

The district court's February 23, 1998 sanctions order required the defendants to present "documentation" evidencing the attorneys' fees and costs they had incurred in defending against Manov's claims (except her malpractice claim) and conducting their Rule 11 discovery. After the defendants submitted such proof, the court, on February 17, 1999, ordered Byrne and Manov to present evidence of their ability to pay the fees and costs the defendants were requesting.[53] Having received their submissions, on June 24, 1999, the court entered an order setting the amount of monetary sanctions to be levied against Byrne and Manov. The order awarded attorneys' fees and costs in the amounts of $50,378.22 to Northside, and $332,500.00 to the Nezhats and the Center.[54] On September 1, 1999, the court entered final judgment for the

---

[52]*See generally,* Fed.R.Civ.P. 26(a)(2) (pertaining to disclosure of expert testimony).

[53]The court's instructions were in accord with *Baker v. Alderman,* 158 F.3d 516 (11th Cir.1998) (holding that a court should take into account a party's ability to pay when determining the amount of monetary sanctions to be awarded).

[54]Because her financial affidavits had not been notarized and were unintelligible, the district court found that Manov failed to comply with its February 17, 1999 order. The court, therefore, held that Manov waived her right to have the court consider her financial ability to pay. Accordingly, the court found Manov liable for 100% and Byrne for 50% of Northside's fees and costs, which the court fixed at $50,378.22. Specifically, the court provided that Byrne and Manov were jointly and severally liable to Northside for $25,189.11 and that Manov was liable to Northside in the additional amount of $25,189.11.

defendants and against Manov and Byrne on all claims and closed the case. These consolidated appeals followed.

Manov appeals (1) the two orders denying her motions to recuse pursuant to 28 U.S.C. § 455(a), (2) the court's dismissal of her claims against Northside, (3) the court's dismissal of all of her claims, except her medical malpractice count, against the Nezhats and the Center, and (4) the court's imposition of monetary sanctions. Byrne appeals the district court's imposition of monetary sanctions as well. We consider first Manov's argument that the district court should have recused.

## II.

Section 455(a) of the United States Code states: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[55] On July 8, 1996, one month after the court ordered Rule 11 discovery, Manov moved the district court to recuse pursuant to this statute. The court denied the motion the next day, following a hearing on various matters.[56] Manov renewed the motion on April 23, 1998, two months after the court entered the first sanctions order. The court denied this motion as well. Both of Manov's motions for recusal were based on the notion that the district court created an appearance of impartiality by having in its chambers a law clerk, McDevitt, who had been employed by one of the law firms representing the Nezhats and the Center in this case and in Mullen's state court case.[57] Manov's second motion added another basis for recusal—the court's

---

Similarly, the court found Manov liable for 100% and Byrne for 50% of the Nezhats and Center's fees and costs. It provided that Byrne and Manov were jointly and severally liable to the Nezhats and the Center for $166,250.00 and that Manov was liable to the Nezhats and the Center in the additional amount of $166,250.00. The amounts awarded by the order were to be paid in equal quarterly installments over a seven year period with interest at the rate of 7% per annum on the unpaid installments.

[55]*See supra* notes 2 and 40.

[56]At the hearing, the court considered, among other things, Manov's motions for the district court's recusal; for leave to file an amended complaint; for leave to conduct Rule 11 discovery; and for an order directing Ceana Nezhat to provide sworn testimony that he was a bona fide physician.

[57]The record does not indicate when Manov's attorneys, Byrne and Neal, learned of McDevitt's former employment. In their brief opposing Manov's renewed motion to recuse, the Nezhats and the Center asserted that Manov's counsel moved to recuse "long after" they knew the identity of the district judge to whom the case had been assigned. Defense counsel did not, unfortunately, provide the date on which they contend Manov's attorneys first learned of McDevitt's former employment. In her reply brief, Manov refuted the contention that she knew of the law clerk's former employment long before she moved for recusal and claimed that she moved for recusal as soon as she learned of it. We note that the basis for Manov's recusal arguments regarding McDevitt—a defense motion filed in Mullen's state court case and signed by McDevitt as co-counsel—was dated December 29, 1994. Nonetheless, we assume that Manov learned of McDevitt's former involvement in Mullen's state court case around July 8, 1996, the date she

rulings against Manov demonstrated that the court's impartiality might reasonably be questioned.  Due to this additional alleged ground for recusal, we address the motions separately.  Our standard of review is whether the district court abused its discretion when it denied Manov's motions.  *Jaffree v. Wallace,* 837 F.2d 1461, 1465 (11th Cir.1988).

A.

At some time prior to the commencement of his law clerk's duties with the district court, McDevitt was employed by Sullivan, Hall, Booth & Smith, an Atlanta law firm.  The firm served as co-counsel for the Nezhats and the Center in the instant case.[58]  The firm also represented the Nezhats and the Center in Mullen's state court case.  The record does not indicate when McDevitt was employed by the Sullivan firm or when he came to work in the district court's chambers.  All we know is that, on January 18, 1996, when Judge Tidwell received the case on reassignment,[59] McDevitt was one of his law clerks.

Judge Tidwell recognized immediately that McDevitt had worked for one of the law firms involved in the case;  therefore, he isolated McDevitt from the case and assigned the matter to another law clerk, Nancy Chapman.  On July 8, 1996, Judge Tidwell learned from reading Manov's motion for recusal that McDevitt, while working as a Sullivan associate, had done some work on Mullen's state court case.  After entertaining Manov's motion for recusal at a hearing the next day, Judge Tidwell said:

> [I]t seems to have become both fashionable and a fad that when any party is faced with an adverse decision that a motion to recuse follows almost as a matter of course.  In this case when the case was filed it was assigned to my law clerk Nancy Chapman because I was aware that Dan McDevitt had been with a firm that had some connection with either this case or with a prior connection.  Dan—I didn't find out until yesterday that I believe it is correct that Dan had worked on some aspect of this case before he came to work for me.  But he has not, will not have any connection with this case. He is and has been and will be completely and totally separated from this case.
>
> It is not unusual for me to separate these cases.  Many times law clerks have accepted a job offer at the conclusion of the law clerk tenure, and when that happens as similar to the situation in this case, I merely just assign any case to be worked on to the other law clerk.  And in this case Dan has not, will not have any part, will not play any part, has not had any input or any connection with this case since it was filed and assigned to me or any rulings that I have made or will make for that matter.

The record before us reveals that McDevitt's involvement in Mullen's state court case was limited to the following:  McDevitt, as a Sullivan associate, worked for Henry D. Green, a Sullivan partner and

---

moved for recusal.

[58]Walbert & Mathis, an Atlanta law firm, also represented the Nezhats and the Center.

[59]*See supra* note 28.

co-counsel of record for the Nezhats and the Center. In this capacity, McDevitt signed a "Brief in Support of Defendants' Motion to Strike Plaintiff's Supplemental Affidavits Filed after October 23, 1994." The brief addressed the issue of whether, under Georgia law, untimely affidavits, filed in opposition to a motion for summary judgment, could be considered by the court in ruling on the motion. In addition to this, McDevitt was shown, along with Green, to have received a copy of one of the orders entered in Mullen's state court case.[60]

The test for determining whether a judge should disqualify himself under section 455(a) is whether a reasonable person knowing all the facts would conclude that the judge's impartiality might reasonably be questioned. *See Hepperle v. Johnston,* 590 F.2d 609, 614 (5th Cir.1979). Stated another way, the question is "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *Carter v. West Pub. Co.,* No. 99-11959-EE (11th Cir. November 1, 1999). Reduced to its essentials, Manov's argument is that, notwithstanding the district court's statements at the July 9 hearing, such an observer would entertain a significant doubt as to the court's impartiality. In other words, the observer would either (1) doubt the court's statement that McDevitt had been isolated from the case from the outset, or (2) conclude that, despite such isolation, there was a substantial likelihood that McDevitt would impart to the court information he had gleaned while working on Mullen's state court case, thereby prejudicing the court against Manov.[61]

The record contains nothing that would cause a reasonable observer to doubt the truth of the court's statement that McDevitt had been, and would continue to be, isolated from the case. Moreover, there is

---

[60] An earlier order in that case, titled "Order on Defendants Motion to Deny Pro Hac Vice Admission to Practice and Order on Motion of James J. Neal to be Admitted Pro Hac Vice to Practice in the State of Georgia" (and granting Neal *pro hac vice* status), lists in a preamble to the order the names of the attorneys for each party as follows: "[t]he Plaintiff was represented by Attorney Michael K. Mixson and James J. Neal; the Defendants were represented by Henry D. Green, Sidney F. Wheeler, Robert D. Roll, Stephen L. Goldner, and Susan V. Sommers." McDevitt's name is not on the list.

[61] Manov's second (renewed) motion for recusal made a similar argument. Manov complained about the court's refusal to allow her to depose McDevitt. Underlying her request to depose McDevitt are the inferences (1) that Manov did not believe Judge Tidwell's statement that McDevitt had not worked on Manov's case and therefore had not passed information to him regarding Mullen's case, and (2) that Manov and her attorneys were uninformed about the extent of McDevitt's involvement in Mullen's case. Given the court's repeated, unambiguous statements about McDevitt's isolation, we find no credence in Manov's position that McDevitt needed to be deposed to find out whether he had passed information about Mullen's case to the court. Moreover, Neal was Mullen's attorney when McDevitt co-signed the December 29, 1994 Brief in Support of Defendants' Motion to Strike Plaintiff's Supplemental Affidavits filed after October 23, 1994. Accordingly, Neal was aware of the extent of McDevitt's involvement in the Mullen litigation.

nothing in the record that could cause a reasonable observer to draw the opposite conclusion—that McDevitt had been serving, and would continue to serve, as the court's elbow law clerk on the case. This brings us to the second inference Manov would have us draw: McDevitt's mere presence in the court's chambers created the appearance that the court was, and would continue to be, partial to the defendants.

As an initial matter we note that "[i]f a clerk has a possible conflict of interest, it is the clerk, not the judge who must be disqualified." *Hunt v. American Bank & Trust Co.,* 783 F.2d 1011, 1016 (11th Cir.1986). Manov contends that because the instant case concerns a law clerk's *former* employment, cases, such as *Hunt,* involving a possible conflict of interest due to a law clerk's *future* employment, are inapplicable. Whereas the isolation of a law clerk when future employment is involved alleviates the significant doubt an objective observer would have about the court's impartiality, Manov says that the same is not true when the case involves former employment.[62]

We disagree for two reasons. First, we reject the underlying assumption of Manov's argument, namely, that when a court employs a law clerk whose former employer appears before the court, there is a stronger basis for questioning the court's impartiality than when a court employs a law clerk who has accepted future employment with a firm appearing before the court. A law clerk has little incentive to influence a judge in an effort to "curry favor" with a former employer. Conversely, a law clerk has a financial incentive to benefit a future employer. Given this financial incentive, if ever a law clerk were of a mind to influence his judge, it would likely be for the benefit of a future rather than a former employer. Because precedent approves the isolation of a law clerk who has accepted future employment with counsel appearing before the court (*see e.g., Hunt,* 783 F.2d at 1015-16) it follows that isolating a law clerk should also be acceptable when the clerk's former employer appears before the court.

---

[62]Manov relies on *Hall v. Small Bus. Admin.,* 695 F.2d 175 (5th Cir.1983), in which a magistrate judge's law clerk worked on a sex discrimination case brought against her former employer, the Small Business Administration ("SBA"). Prior to accepting the clerkship, the law clerk had worked for the SBA during the same time period as the plaintiff. *See id.* at 176. The law clerk had resigned from the SBA because she felt she was the victim of sexual discrimination. *See id.* Thereafter, as the magistrate judge's law clerk, she participated in the pre-trial process, prepared bench memoranda, and worked on the order disposing of the case on the merits. *See id.* at 176-79. While *Hall* mentioned the law clerk's former employment, the event that triggered the magistrate judge's obligation to recuse or isolate the law clerk was her acceptance of employment with plaintiff's counsel while working on the case for the court. *See id.* at 179. Therefore, although Manov correctly noted in her brief to the district court that the law clerk in *Hall* worked for the defendant (the SBA) before her employment with the court, this fact was not the basis for the *Hall* court's decision. *Hall* is, therefore, inapposite. Consider that the court of appeals explained that "[w]hether or not the law clerk actually affected the magistrate's decision, her continuing participation with the magistrate in a case in which her *future employers* were counsel gave rise to an appearance of partiality." *Id.* at 179 (emphasis added).

Second, we note that a law clerk has no incentive to violate a court's instruction that he isolate himself from the case and thereby subject himself to discharge. In this case, the district judge explained that, as a matter of course, he isolates law clerks from cases involving past or future employers. The obvious purpose of this procedure is to ensure that the appearance of impartiality does not arise; as such, only a foolhardy law clerk would purposely circumvent the court's instruction by attempting to pass on information about a case. In sum, we hold that the district court did not abuse its discretion in denying Manov's first motion for recusal.

B.

As noted, Manov's second motion for recusal cited the district court's rulings against Manov and asserted that such rulings would lead a reasonable observer to harbor a significant doubt about the court's impartiality. We are not persuaded. Precedent clearly holds that adverse rulings alone do not provide a party with a basis for holding that the court's impartiality is in doubt. *Carlsen v. Duron,* 229 F.3d 1162, No. 99-4065 (10th Cir.2000) (unpub.disp.). Given this precedent, Manov's argument, that the court's refusal to recuse was an abuse of discretion, fails.

III.

We now turn to the remaining issues in this appeal. First, we determine *de novo* whether the district court erred as a matter of law in dismissing Manov's claims against Northside in Counts III and IV. *See Haitian Refugee Ctr. v. Baker,* 949 F.2d 1109, 1110 (11th Cir.1991) ("[I]f the trial court misapplies the law we will review and correct the error without deference to that court's determination."). Second, we determine whether the court abused its discretion in imposing sanctions against Manov and Byrne, which, except for Manov's medical malpractice claim, included the dismissal of the remaining counts of the complaint. *See United States v. Sigma Intern., Inc.,* 244 F.3d 841, 852 (11th Cir.2001) (In determining whether the court abused its discretion we ask whether it "applie[d] the wrong legal standard or ma[de] findings of fact that are clearly erroneous.") (internal citations omitted).

Both of these determinations—whether the court erred as a matter of law in dismissing the claims against Northside or abused its discretion in awarding sanctions—are guided by the fact that the root of this litigation is the medical malpractice claim that Manov brought against Drs. Farr and Camran Nezhat and the Center in the Fulton County Superior Court in August 1994. Manov alleged that she came to the Center in September 1992 for laproscopic surgery to alleviate endometriosis. The surgery was to be performed by Drs. Farr and Camran Nezhat. Prior to surgery, they informed her that her appendix may be infected and, if so,

it should be removed when they performed the laproscopy. Manov agreed, and executed a consent both to the laproscopic procedure and a "possible appendectomy and any other procedure deemed necessary." During the laproscopic procedure, the doctors decided that Manov's appendix was infected and performed the appendectomy. Manov contended that the appendix was not infected and that the doctors were negligent in removing it. They were also negligent, she asserted, in the manner in which they performed the appendectomy because they left a portion of the appendix in her abdomen. This, in turn, caused an infection, which required further hospitalization and caused other complications.

As our discussion unfolds, it will become clear that the allegedly botched appendectomy and the resulting complications constitute the sum and substance of the injury Manov suffered in this case. Every count of the complaint, including Manov's Georgia RICO claim, derives from the appendectomy. With this background in mind, we address the issues posed above. We begin with the dismissal of Manov's claims against Northside in Counts III and IV.

A

1.

Count III alleged that Northside breached its "duty of due care to monitor and investigate the ... practice of surgery [by the Drs. Nezhat] at Northside." Among other things, Northside failed to check the Nezhats' credentials, protect the Nezhats' patients from experimental and unnecessary surgery, and prevent the Nezhats from ordering nurses to perform medical procedures required by law to be performed by physicians. But for such negligence, argued Manov, Drs. Farr and Camran Nezhat would not have performed the appendectomy at issue.

The district court dismissed Count III pursuant to Rule 12(c) of the Federal Rules of Civil Procedure as time barred.[63] As noted *supra,* Byrne voluntarily dismissed Manov's state court suit against Drs. Farr and

---

[63]Although Northside moved, and the district purported, to dismiss Count III pursuant to Fed.R.Civ.P. 12(b)(6), we treat the court as having made the ruling pursuant to Rule 12(c). *See* notes 46, and 47 *supra.* In order to conclude that the statute of limitations on Manov's Count III negligence claim had run and that the claim was not saved by the Georgia renewal statute, the court considered a fact not alleged in the complaint, to-wit: that Manov's malpractice complaint in the Fulton County Superior Court did not name Northside as a defendant. Because it considered a fact not alleged in the complaint, the court should have treated Northside's motion as one for summary judgment and disposed of it as provided by Fed.R.Civ.P. 56. Because the court did not do so, Manov contends that we should vacate the court's judgment on Count III and remand the case for further proceedings so that she may "be given reasonable opportunity to present all material made pertinent by such a motion by Rule 56." Fed.R.Civ.P. 12(b) and (c).

The court's error was harmless. *See Denis v. Liberty Mut. Ins. Co.,* 791 F.2d 846, 850 (11th Cir.1986); *Boateng v. Interamerican Univ., Inc.,* 210 F.3d 56, 60 (1st Cir.2000). As the

Camran Nezhat and the Center on July 13, 1995, and refiled it in the district court on January 12, 1996, one day before the six month period under Georgia's renewal statute expired. O.C.G.A. § 9-2-61. When Byrne refiled the case in the district court, he added Northside as a defendant.

Georgia's renewal statute provides that when an action is commenced in state court within the proper statute of limitations period, and the plaintiff voluntarily dismisses the action, the plaintiff may recommence the proceeding in federal court within six months after the dismissal. O.C.G.A. § 9-2-61. The district court found that the statute of limitations had expired on Manov's negligence claim against Northside. Under Georgia law, a plaintiff must bring a negligence action within two years of the act giving rise to the claim. O.C.G.A. § 9-3-33. Since Manov underwent surgery at Northside in September 1992, her negligence claim against Northside should have been brought by September 1994. She did not bring the claim until January 1996—thus, it was barred by the statute of limitations. The claim was not saved by Georgia's renewal statute because the statute only suspends the running of the statute of limitations against defendants named in the original complaint. *Cornwell v. Williams Bros. Lumber Co.,* 139 Ga.App. 773, 229 S.E.2d 551, 552 (1976); *Wagner v. Casey,* 169 Ga.App. 500, 313 S.E.2d 756, 758 (1984).[64] We agree with the district court's holdings that the statute of limitations had run on Manov's Count III claim against Northside and that the renewal statute did not save it. Accordingly, the court did not err in dismissing the count.

2.

Count IV alleged that the defendants, including Northside, violated Georgia's RICO law by engaging in racketeering activity. The district court dismissed Northside as a Count IV defendant on the ground that Northside was not capable of committing a crime. Under Georgia law, a corporation *qua* corporation, cannot be held to answer for a crime, and therefore could not violate the Georgia RICO statute. O.C.G.A. § 16-2-22(a)(2); *Cobb County v. Jones Group,* 218 Ga.App. 149, 460 S.E.2d 516, 521 (1995). This is not to say that a corporation may disregard the law with impunity. If a crime has been committed, the agents of the corporation who are responsible are subject to prosecution. Manov's amended complaint, however, neither

---

record amply demonstrates, at the time the court entertained Northside's motion to dismiss, the record was replete with references—some made by Manov's counsel—to the complaint in Manov's state court case, to the fact that the complaint did not name Northside, and to the date Byrne dismissed the case. In sum, Manov acknowledged, albeit tacitly, that there was no dispute concerning the facts relating to the time-bar issue.

[64]Manov contends that the statute of limitations was tolled on the theory that Northside somehow defrauded her. The district court rejected the theory as patently frivolous, and we do as well.

alleges nor mentions which Northside agent was responsible for Northside's violation of the Georgia RICO statute. We, therefore, find no error in the district court's dismissal of the RICO claim against Northside.[65]

B.

Having disposed of the first issue posed above, we turn to the second issue: whether the district court abused its discretion when it granted both Northside's and the Nezhats and Center's motions for sanctions, required Byrne and Manov to pay the defendants' attorneys' fees and costs, and dismissed all but one of Manov's claims against the Nezhats and the Center. The district court took this action pursuant to three separate sources of authority: Fed.R.Civ.P. 11, 28 U.S.C. § 1927, and the court's inherent power.

In reviewing the award of sanctions, we first discuss these sources of authority. After that, we examine the award of sanctions against Byrne and Manov. Specifically, we determine whether the district court abused its discretion because, as Manov contends, the court erred in concluding that the claims it dismissed (against the Nezhats and the Center) lacked a factual foundation. We have already determined that the court did not err in dismissing her claims against Northside; hence, as to that defendant, the question is whether the court abused its discretion in awarding Northside attorney's fees and costs. We defer answering that question at this juncture because the answer becomes self-evident after we examine Manov's complaint as a whole and find it (except for Count I) baseless.[66]

1.

In considering a motion for sanctions pursuant to Fed.R.Civ.P. 11,[67] a court conducts a two-step inquiry: "(1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous." *Baker v. Alderman,* 158 F.3d 516, 524 (11th Cir.1998). When filing a pleading in federal court, an attorney "certifies that he or she has conducted a reasonable inquiry and that the pleading is well-grounded in fact, legally tenable, and 'is not presented for any

---

[65]Given this disposition, we defer discussion of whether Count IV alleged a RICO violation against any defendant.

[66]Although the district court, in handing down its February 23, 1998 sanctions order, did not formally have before it the Nezhats and Center's affirmative defense of failure to state a claim for relief, *see supra* notes 35, 44, 46 and 47, it had to examine Manov's claims and find them either legally insufficient or factually unsupported in order to impose the sanctions at issue—both the dismissal of the claims and the award of attorney's fees and costs. Therefore, in order to hold that the court's action did not constitute an abuse of discretion, we must satisfy ourselves that the dismissed counts lacked a legal or factual basis.

[67]*See supra* note 1 for the pertinent text of Rule 11.

improper purpose.' " *Id.* (quoting Fed.R.Civ.P. 11(b)). Thus, if, after dismissing a party's claim as baseless, the court finds that the party's attorney failed to conduct a reasonable inquiry into the matter, then the court is obligated to impose sanctions even if the attorney had a good faith belief that the claim was sound. *In re Mroz,* 65 F.3d 1567, 1573 (11th Cir.1995). Although typically levied against an attorney, a court is authorized to issue Rule 11 sanctions against a party even though the party is neither an attorney nor the signor of the pleadings. *See Souran v. Travelers Ins. Co.,* 982 F.2d 1497, 1508 n. 14 (11th Cir.1993) (" 'Even though it is the attorney whose signature violates the rule, it may be appropriate under the circumstances of the case to impose a sanction on the client.' " (quoting Fed.R.Civ.P. 11 advisory committee's note)).

The second source of authority for the sanctions levied in this case is 28 U.S.C. § 1927, which states:

> [a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

As the express language of section 1927 indicates, this sanctioning mechanism is aimed at the unreasonable and vexatious multiplication of proceedings. Unlike Rule 11, which is aimed primarily at pleadings, under section 1927 attorneys are obligated to avoid dilatory tactics throughout the entire litigation. Also unlike Rule 11, "awards pursuant to § 1927 may be imposed only against the offending attorney; clients may not be saddled with such awards." *United States v. Int'l B'hd of Teamsters, Chauffeurs,* 948 F.2d 1338, 1345 (2d Cir.1991).

The third source of authority for the award of sanctions in this case is the district court's inherent power. This power is derived from the court's need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991). The "inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers,* 501 U.S. at 46, 111 S.Ct. at 2133.

One aspect of a court's inherent power is the ability to assess attorneys' fees and costs against the client or his attorney, or both, when either has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."[68] *Id.* at 45-46, 111 S.Ct. at 2133. This court has explained that "[t]he key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir.1998); *see also Mroz,* 65 F.3d at 1575 ("Invocation of a court's inherent power requires a finding of bad faith."). A court

---

[68] This is sometimes referred to as the bad faith exception to the American Rule against fee shifting. *United States v. Int'l B'hd of Teamsters, Chauffeurs,* 948 F.2d 1338, 1345 (2d Cir.1991).

should be cautious in exerting its inherent power and "must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Chambers,* 501 U.S. at 50, 111 S.Ct. at 2132. Because the court's inherent power is so potent, it should be exercised "with restraint and discretion."[69] *Id.*

2.

The district court awarded sanctions against Byrne and Manov because the claims in the amended complaint, apart from the malpractice claim, lacked either a legal or a factual basis and because Byrne had failed to conduct a reasonable inquiry into the factual bases of the claims. As we have concluded, the district court properly dismissed Manov's claims against Northside. Our ensuing discussion, therefore, concerns Manov's claims against the Nezhats and the Center. The district court found those claims—in Counts II, IV, V[70]—lacking because "plaintiff and plaintiff's counsel have failed to conduct an investigation that is reasonable, objective and proper under the circumstances before filing ... the complaint[ ]; the [complaint] [is] replete with false and baseless claims and allegations, which plaintiff and her counsel knew or with reasonable investigation should have know [sic] to be irresponsible and baseless." Reading this language in the light of (1) the defendants' May 3, 1996 letter to the court, asserting that Byrne had not conducted the sort of independent pre-filing investigation required by Rule 11, and (2) the court's June 5, 1996 order granting the defendants leave to conduct Rule 11 discovery to determine "if [Byrne had conducted an] appropriate pre-filing investigation of the facts underlying the allegations [of the complaint]," we conclude that the court did not dismiss Counts II, IV, and V because they failed to state claims recognized by the law. Rather, the court dismissed those counts because the Rule 11 discovery revealed that Byrne had not conducted the requisite pre-filing investigation to determine the truth of the factual allegations contained in Manov's complaint.

Our review of the district court's award of sanctions necessarily begins with an analysis of the

---

[69]In *Chambers,* the Supreme Court indicated that the district court made detailed factual findings concerning the sanctioned party's involvement in the events of the case. *See id.* at 58, 111 S.Ct. at 2139. Recognizing the need for caution, some circuits require that a district court make a particularized showing of bad faith to justify the use of its inherent power. *See, e.g., United States v. Int'l B'hd of Teamsters, Chauffeurs,* 948 F.2d 1338, 1345 (2d Cir.1991) (citing *Oliveri v. Thompson,* 803 F.2d 1265, 1272 (2d Cir.1986) (requiring "a high degree of specificity in the factual findings of [the] lower courts")).

[70]As noted *supra,* the amended complaint contained six counts. Count VI was a claim for punitive damages. Count VI did not state an independent cause of action; instead, it only sought punitive damages for the preceding claims, Counts I through V.

complaint, here the amended complaint. We note that, if the facts as pled failed to state a claim for relief, it was irrelevant whether Byrne conducted the requisite Rule 11 pre-filing factual investigation. Identifying Manov's claims—in terms of their legal underpinnings—is not difficult; the heading of each count announces whether the claim is for negligence, fraud, and so forth. The problem lies in determining which factual allegations of the complaint relate to which cause of action. The amended complaint, containing 6 counts, consists of 32 pages and 126 paragraphs. The amended complaint was drafted like the original complaint, in that each of the counts following Count I incorporated by reference every paragraph, and therefore every count, preceding it. Each count added a few paragraphs, which, in turn, were incorporated into the next count. In drafting a complaint this way, the pleader inevitably incorporates into a count factual allegations, and even defendants, that are not germane to the cause of action purportedly stated in that count. Accordingly, to determine whether a claim was legally cognizable, we must strip the claims to their essentials, which, in this case, requires considerable weeding. Having done so, we conclude that Count II, fraud, Count IV, Georgia RICO, and Count V, battery were properly dismissed because they lacked factual support. Moreover, even if we accept Count IV's factual allegations as true, the count still fails because it failed to state a cause of action.

a.

The district court had no difficulty, and neither do we, in discerning the allegations that relate to Count I, the medical malpractice claim. Given the circumstances set forth above surrounding the September 1992 surgery performed by Drs. Farr and Camran Nezhat at Northside, the court properly held that Count I stated a claim for relief.

b.

Count II—fraud on the part of Drs. Farr and Camran Nezhat and the Center—and Count V—battery on the part of Drs. Farr, Camran, and Ceana Nezhat—are based almost exclusively on the facts giving rise to Count I. In Count II, Manov alleged that the defendants Nezhat obtained her consent to the appendectomy by fraudulently misrepresenting the potential presence of endometriosis on her appendix. In other words, the doctors knew that her appendix was healthy and lied when they told Manov that it might be infected. Their motive for lying, Manov alleged, was their "desire for continued financial gain at the expense of [Manov's] health and safety." In Count V, Manov alleged that the above fraudulent misrepresentation "vitiated" her

consent; thus, in performing the appendectomy, the doctors committed a battery.[71]

The district court properly found that Manov consented to the appendectomy. Manov does not dispute that she signed a consent form agreeing to the procedure. Thus, a contract between Manov and Drs. Farr and Camran Nezhat (the defendants who performed the appendectomy) was formed. *Mattair v. St. Joseph's Hospital, Inc.,* 141 Ga.App. 597, 598, 234 S.E.2d 537 (1977). In entering into the contract, the physicians implicitly promised to exercise the care and skill required by the medical profession in the community. *Id.* Count I of the complaint alleged that the Drs. Farr and Camran Nezhat and the Center breached this duty of care.

Under Georgia law, one who consents to a surgical procedure cannot thereafter sue the surgeon for battery. Battery is an unlawful touching, so one who consents to being touched cannot claim a battery. Manov, however, attempted to circumvent this bar by contending that the physicians procured her consent through fraud—by stating falsely that her appendix might be infected. The district court rejected Manov's attempt because there is nothing in the record—save a bald assertion in her complaint—to support her allegation that the doctors knew in advance that her appendix was healthy and should not be removed. In any event, the doctors statements constituted reasoned medical opinions about what they might find once the laproscopic procedure was underway. Such statements do not amount to fraud. *Cannon v. Smith,* 187 Ga.App. 434, 370 S.E.2d 529, 531 (1988) ("At best, [such] allegations might establish negligence but not fraud."). In sum, both Count II-Fraud and Count V-Battery were nothing more than thinly veiled attempts to recast the malpractice claim. As such, these counts were not factually supportable.

c.

Finally, we turn to the meat of Manov's amended complaint: Count IV alleging the violation of the Georgia RICO statute by all defendants.[72] The statute makes it "unlawful for any person"

> (a) ... through a pattern of racketeering activity or proceeds derived therefore, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

> (b) ... employed by or associated with any enterprise to conduct or participate in directly or indirectly, such enterprise through a pattern of racketeering activity.

---

[71]The Count V claim against Ceana Nezhat has nothing to do with the laproscopy or appendectomy. The count alleges that Ceana Nezhat lacked a medical degree; consequently, when he performed a medical examination on Manov two months after the surgery, he committed a battery. As we indicate *infra,* the contention that Ceana Nezhat lacked a medical degree has no factual basis in the record.

[72]Count IV consisted of 18 pages and 60 paragraphs.

(c) ... to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of the Code section.

O.C.G.A. § 16-14-4. Neither Count IV nor any other part of the amended complaint cites which of these provisions the defendants allegedly violated. We rule out a violation of subsection (c) because neither the count nor the amended complaint speaks of a conspiracy. Due to the pleader's failure to track any of the statutory language—with the exception of the words "enterprise" and "pattern of racketeering activity"—we cannot say with confidence whether Manov meant to allege a violation of subsection (a) or (b) or both.

While never identifying which subsection of O.C.G.A. § 16-14-4 the defendants allegedly violated, both the original complaint and the amended complaint alleged that each defendant was an "enterprise" and engaged in a "pattern of racketeering activity." The racketeering activity pled in the amended complaint consisted of eleven separate acts. The ensuing discussion depicts these acts in greater detail; we list them briefly here by means of an introduction. The racketeering acts were introduced with headings. The first was "18 U.S.C. 1341." It was followed by "FALSE/FRAUDULENT BILLIING," "$200.00 INITIAL HOSPITAL CHARGE," "SERVICES PROVIDED BY ONLY ONE PHYSICIAN," "SERVICES PROVIDED BY NON-PHYSICIANS," "SEVERITY OF DISEASE/'22' MODIFIERS," "INSURANCE FORM INFORMATION," "ESTROPEL," "HOSPITAL COMPLICITY," "EVIDENCE TAMPERING," and "INFLUENCING WITNESSES."

Finally, we note that Count IV incorporates by reference all prior counts; therefore, it includes Count I-Malpractice, Count II-Fraud, and Count III-Negligence by Northside. Counts II and III do double service in that Count IV explicitly states that they also constituted acts of racketeering. Count V, the battery count, while not incorporated by reference, nonetheless serves as the basis for an act of racketeering as well. With these observations in mind, we examine the legal sufficiency of Count IV, specifically, each act of racketeering.

We dispose easily of the alleged acts of racketeering that amount to nothing more than the same fraud and battery charged in Counts II and V. Our prior discussion of these counts demonstrates they were pled without a factual basis. Similarly, the act of racketeering entitled "Hospital Complicity" is legally insufficient because, as discussed supra Part III.A.2, the pleader did not identify the Northside agent(s) responsible for the allegedly unlawful conduct.

The remaining acts of racketeering are all anchored on the federal mail fraud statute, 18 U.S.C. § 1341. To determine if these acts of racketeering were pled with legal or factual sufficiency, we review this

circuit's requirements for pleading mail fraud in civil RICO cases. Mail fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails in furtherance of that scheme. *See Pelletier,* 921 F.2d at 1498; *United States v. Downs,* 870 F.2d 613, 615 (11th Cir.1989). *Pelletier* explains that in a criminal prosecution "the government ... is not required to show that the intended victim was actually deceived and suffered injury." *Id.* at 1499*; United States v. Dynalectric Co.,* 859 F.2d 1559 (11th Cir.1988). A private plaintiff, however, such as Manov, must show not only that the mail fraud statute has been violated, but that she suffered injury as a result of the violation. *Pelletier,* 921 F.2d at 1499-1500 (stating that "when the alleged predicate act is mail ... fraud, the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme").

In that the mail fraud statute "has been interpreted by the Supreme Court and lower courts to include a proximate cause requirement—the plaintiff's injury must have been proximately caused by the commission of the predicate acts." *Pelletier,* 921 F.2d at 1499. This court's restrictive view of the proximate cause requirement[73] means that a plaintiff has standing to sue only if his injury flowed directly from the commission of the predicate acts. *Id; see also Gentry v. Volkswagen of America, Inc.,* 238 Ga.App. 785, 521 S.E.2d 13, 19 (1999). As such, a plaintiff lacks standing to assert, as the basis for mail fraud, misrepresentations directed toward another person or entity. *See Johnson Enter. v. FPL Group, Inc.*, 162 F.3d 1290, 1313 (11th Cir.1998); *see also Gentry v. Volkswagen of America, Inc.,* 238 Ga.App. 785, 521 S.E.2d 13, 19 (1999) (citing *Pelletier* and *Johnson Enterprises* for the proposition that, "[t]he question is whether the injury was directly caused by any RICO violation, not whether the injury was reasonably foreseeable ... In this case, the alleged misrepresentations were directed to [a non party, not the plaintiff] ... [Therefore,] [t]he [plaintiff] lacks standing to pursue a RICO claim based on those misrepresentations").

The following analysis of the remaining acts of racketeering reveals that they fail for either or both of the following reasons: (1) they do not state an injury to Manov or (2) they assert injuries allegedly suffered by third persons (namely Mullen). We consider these acts of racketeering in turn.

One alleged act of racketeering, pled in paragraphs 59-65 of the amended complaint, was that the

---

[73]In *Pelletier,* we explain that the circuit courts hold differing views on whether the proximate cause requirement "limits damages recoverable to those caused directly by the predicate act (e.g., by reliance on the defendant's fraudulent representations) or to those caused indirectly by the predicate act (e.g., by purchasing property at a price that has been artificially inflated by a scheme to defraud)." *Id.* at 1499. We adhere to the more restrictive view.

defendants Nezhat committed medical journal fraud. The crux of this allegation is that the Nezhats used their medical journal articles as part of a marketing scheme to obtain money by false pretenses. In short, the amended complaint alleged that the defendants Nezhat used "the popular media" to advertise falsely their credentials and success rates. In particular, it alleged that the Nezhats falsely advertised that they developed the use of "surgery via laparoscope with a picture on a television screen" and that their work produced the highest pregnancy rates ever reported. The amended complaint further alleged that the Nezhats hired a public relations firm to ensure that their surgical successes were published in the popular media and that they authored a series of medical journal articles in which they claimed to have developed new, successful procedures.

According to the amended complaint, the Nezhats' representations to the media and in their journal articles were false because (1) the Nezhats could not produce a list of patients referenced in their articles without considerable effort, and (2) potential co-authors withdrew from the articles because the Nezhats were unable to verify patient data. Manov alleged that the Nezhats devised this marketing scheme to entice patients to travel to Atlanta, and that they executed the scheme in violation of the federal mail fraud statute, 18 U.S.C. § 1341. Manov alleged that she "was attracted to Atlanta by virtue of the aforementioned scheme, which included the use of the U.S. mails in furtherance of the scheme, and was injured thereby."

Manov is not a victim of a fraudulent misrepresentation. She sought the services of the Nezhats so they could surgically alleviate her endometriosis. The Nezhats represented to Manov that they would perform surgery to rectify her endometriosis and remove her appendix if it was infected. Any alleged injury Manov suffered as a result of this representation would be the result of malpractice, not fraud. In an attempt to recover treble damages under the Georgia RICO statute, however, the amended complaint's allegations about the Nezhats' purported misrepresentations reach far beyond her surgery to alleviate her endometriosis—the allegations encompass utter irrelevancies. For instance, Manov's surgery was conducted with a laparoscope; beyond this fact, there is no connection between her surgery and an allegation that the Nezhats falsely claimed to have invented laparoscopic surgery.

Furthermore, claims of surgical success in medical journals and popular magazines seem more akin to puffing than actionable misrepresentations. The label attributed to the Nezhats' statements, however, is unimportant because (1) none of the alleged misrepresentations were made to Manov, and (2) the alleged misrepresentations were unrelated to any harm suffered by Manov. Thus, insofar as Manov's mail fraud claim is based on medical journal and media fraud, it fails as a matter of law because the facts do not support a

prima facie case for fraud.

Finally, we note that Neal asserted this same medical journal fraud claim as an act of racketeering in Mullen's state court case. The Fulton County Superior Court dismissed Mullen's RICO claim on summary judgment, and the Georgia Court of Appeals affirmed on October 22, 1996, shortly after Manov filed the amended complaint now before us.[74]

Paragraphs 66-68 of the amended complaint bore the heading "FALSE/FRAUDULENT BILLING." None of the eleven instances of fraudulent billing listed under this heading, however, injured Manov. The amended complaint never specified how the supposed acts of fraudulent billing even related to Manov. Because "a civil RICO plaintiff must show ... that he was injured by reason of the defendant's acts of deception," *Pelletier,* 921 F.2d at 1499, this allegation fails as a matter of law.

Paragraphs 69-71 of the amended complaint bore the heading "$200.00 INITIAL HOSPITAL CHARGE." While these paragraphs alleged an injury to Manov in that she contends she was billed for a service she did not receive, this claim fails as an act of racketeering, because the allegations did not demonstrate how the billing constituted mail fraud. "When the alleged predicate act is mail ... fraud, the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme." *Tom's Amusement Co., Inc. v. Total Vending Serv.,* 243 Ga.App. 294, 533 S.E.2d 413, 419 (2000) (citing *Pelletier,* 921 F.2d at 1499). The amended complaint neither alleged that Manov was a target of the Nezhats' scheme to defraud patients by billing an initial hospital charge, nor that Manov relied on the misrepresentation to her detriment and suffered harm as a result. In fact, in her deposition (taken during Rule 11 discovery), she admitted that regarding "the monies she was charged for the services that were performed by the Nezhats, ... she was not out of pocket for any of those medical services." Furthermore, Manov's allegations that Mullen and a Judy Glatzer, another Nezhat patient, may have been billed an initial hospital charge for care they did not receive is of no moment. A plaintiff lacks standing to seek damages for mail fraud perpetrated on another person or entity. *See Johnson Enter. v. FPL Group, Inc.,* 162 F.3d 1290, 1313 (11th Cir.1998).

Paragraphs 72-73 of the amended complaint bore the heading "SERVICES PROVIDED BY ONLY ONE PHYSICIAN." Manov believed that only Dr. Farr Nezhat was present for one of her surgeries, but she received a bill for the services of both Drs. Farr and Camran Nezhat. The district court found that there was

_____

[74]*See supra* note 12.

no factual basis for this allegation and that Byrne would have realized that the claim was frivolous had he conducted a reasonable investigation. But, whether or not there was a factual basis, the allegation was flawed because it failed to include the elements of fraud. Paragraphs 72 and 73 are not saved by Manov's assertion that Mullen also believes that she was billed for the services of both Drs. Farr and Camran Nezhat when only one of them was present at her surgery. As explained above, Manov lacks standing to bring a claim based on an alleged misrepresentation to a third party. *See Johnson Enter. v. FPL Group, Inc.,* 162 F.3d 1290, 1313 (11th Cir.1998).

Paragraphs 74-75 of the amended complaint bore the heading "SERVICES PROVIDED BY NON-PHYSICIANS." These paragraphs alleged that the Center routinely billed for physician services when the services were actually "performed by a non-physician, such conduct in violation of 18 U.S.C. 1341 (Mail Fraud), O.C.G.A. § 16-8-3 (Theft by Deception), and O.C.G.A. § 16-5-23 (Battery)." Manov based this allegation on her lawyers' belief that Ceana Nezhat had not been awarded a medical degree.[75] Because he was not a licensed physician, the amended complaint asserted that his vaginal examination of Manov two months after her appendectomy constituted a battery.[76]

We agree with the district court that this allegation was frivolous because it lacked a factual basis. Moreover, it typified the harassing, bad faith nature in which Manov's attorneys prosecuted this case. *Cf. Pelletier,* 921 F.2d at 1514 (stating that Rule 11 sanctions are warranted when a party files a pleading in bad faith for an improper purpose). The factual inadequacies aside, the allegation was legally frivolous because the simple battery alleged in this case was not, and could not have been, an act of racketeering.

The amended complaint cited simple battery, O.C.G.A. § 16-5-23, as an act of racketeering. Simple battery is a misdemeanor. O.C.G.A. § 16-5-23(b). While Georgia RICO's definition of racketeering activity includes a crime "in Article 2 of Chapter 5, relating to bodily injury" (O.C.G.A. § 16-14-3(9)(A)(v)), the precatory language at the beginning of the definition clearly states that racketeering activity constitutes "any crime which is chargeable by indictment" (O.C.G.A. § 16-14-3(9)). At issue, then, is whether "chargeable by indictment" means *must* be charged by indictment or *may* be charged by indictment. Article 2 of Chapter 5 of Georgia's statutory code contains seven assault and battery laws. Some of these laws are misdemeanors

---

[75]*See supra* note 39. Manov also alleges that the defendants forced nurses to perform artificial inseminations, a procedure they claim Georgia law authorizes only physicians to perform.

[76]We note that Manov repeats this allegation in Count V as another instance of battery committed by the Drs. Nezhat.

(such as the simple battery alleged in this case), and some are felonies.[77]  The reference in the definition of racketeering activity to "the laws in Article 2 of Chapter 5" (O.C.G.A. § 16-4-3(9)(A)(v)) seems to indicate that a violation of *any* of "the laws in Article 2 of Chapter 5" constitutes racketeering activity without regard to whether the violation is a misdemeanor or a felony.  Consider that all crimes, including misdemeanors, may be charged by indictment.  O.C.G.A. § 17-7-71.  Felonies, however, must be charged by indictment unless the right to an indictment is waived.  O.C.G.A. § 17-7-70.  If "chargeable by indictment" means *may* be charged by indictment, every crime would constitute racketeering activity.  We do not think the scope of Georgia RICO is so broad.

The Georgia Supreme Court has held that misdemeanors are not included in the definition of racketeering activity.  In *Clark v. Security Life Insur. Co.,* 270 Ga. 165, 509 S.E.2d 602, 605 (1998), it stated:

> O.C.G.A. § 16-14-3(9)(A) meticulously defines "racketeering activity" by reference to specific state and federal statutes.  O.C.G.A. § 16-14-3(9)(B) provides that "racketeering activity" shall also include various crimes punishable as federal or state crimes by imprisonment for more than one year.  Violations of the insurance code, *which are misdemeanors, are not included in this definition.*

(emphasis added).  Although interpreting the catch-all provision in the definition of racketeering activity, O.C.G.A. § 16-4-3(9)(B), *Clark* clearly evidences the Georgia Supreme Court's unwillingness to import misdemeanor conduct into the definition of racketeering activity.

The [Georgia] General Assembly enacted RICO

> "to impose sanctions against [the] subversion of the economy by organized criminal elements and to provide compensation to private persons injured thereby.  It is not the intent of the General Assembly that *isolated incidents of misdemeanor conduct* be prosecuted under this chapter but only an interrelated pattern of criminal activity, *the motive or effect of which is to derive pecuniary gain.*"

*Sevcech v. Ingles Markets, Inc.,* 222 Ga.App. 221, 474 S.E.2d 4, 6 (1996) (second alteration in original) (citing O.C.G.A. § 16-14-2(b)).  Finally, Georgia RICO's version of a catch-all provision, which makes out-of-state and federal offenses acts of racketeering, requires that the offenses be felonies, i.e., crimes "chargeable under the laws of the United States or any of the several states and ... punishable by imprisonment for more than one year."  O.C.G.A. § 16-14-3(9)(B).

Pretermitting the question of whether Georgia RICO's definition of racketeering activity includes the

---

[77]Article 2 of Section 5 of Georgia's statutory code lists the following crimes:  16-5-20 Simple Assault (a misdemeanor with exceptions), 16-5-21 Aggravated Assault (a felony), 16-5-22 Conviction of assault with intent to commit a crime if the intended crime is actually committed, 16-5-23 Simple battery (a misdemeanor unless against a person who is 65 years of age or older, in a public transit vehicle, against a police officer, against a family member, against a person licensed as a long term or health care professional), 16-5-23.1 Battery (a misdemeanor with exceptions), 16-5-24 Aggravated battery (a felony), 16-5-25 Opprobrious or abusive language as justification for simple assault or simple battery.

misdemeanor of simple battery,[78] we find that Georgia RICO does not include the type of isolated, simple battery alleged in this case. *See Larson v. Smith,* 194 Ga.App. 698, 391 S.E.2d 686, 688 (1990) (stating that "[i]t is not the intent of the General Assembly that *isolated incidents of misdemeanor conduct* be prosecuted under [this chapter] but only an interrelated pattern of criminal activity, the motive or effect of which is to derive pecuniary gain") (first alteration in original) (emphasis added). The amended complaint did not indicate that Ceana Nezhat committed this alleged battery on Manov on more than one occasion. Moreover, the amended complaint failed to state a claim under Georgia RICO because it alleged an isolated instance of simple battery rather than an interrelated pattern of activity intended to derive pecuniary gain.[79]

The other alleged acts of racketeering were similarly flawed. Consider paragraphs 76-79 of the amended complaint which bore the heading "SEVERITY OF DISEASE/ '22' MODIFIERS."[80] In these paragraphs, Manov alleged that the procedure to remove her healthy appendix was labeled with a 22 modifier code *prior* to surgery. Byrne, in his deposition, explained that 22 modifier codes were used on insurance forms for surgery if, *after* the surgery in question, the surgeon determined that a higher bill was justified because the surgery was more complex than usual. Manov also alleged that Mullen's surgical procedure was labeled with a 22 modifier code. This conduct did not constitute an act of racketeering under Georgia RICO for two reasons. First, the use of a 22 modifier code to describe Manov's surgery did not injure Manov, and, under *Pelletier,* a plaintiff must suffer a direct injury as a result of a defendant's violation of the mail fraud statute. 921 F.2d at 1499. Second, the use of a 22 modifier code in Mullen's case caused Manov no harm, and, under *Johnson Enterprises,* a plaintiff lacks standing to assert a misrepresentation made to another person. *See* 162 F.3d at 1313.

Paragraphs 80-81 of the amended complaint bore the heading "INSURANCE FORM INFORMATION." Manov alleged that the Nezhat defendants submitted forms to insurance companies indicating that patients had not pre-paid for services even though some patients, such as Manov, had pre-paid

---

[78]Such a determination is not necessary to our decision and is better left to the Georgia courts.

[79]We note that all of the alleged incidents of racketeering activity are similarly deficient; as such, plaintiff has failed to allege an "interrelated pattern of activity intended to derive pecuniary gain."

[80]The amended complaint does not allege which Georgia or federal law was violated by the use of a "22 MODIFIER CODE" or by the following act of racketeering, "INSURANCE FORM INFORMATION." Giving Manov the benefit of the doubt, we assume that the amended complaint alleged that these acts were part of a mail fraud scheme.

for services. Nowhere did the amended complaint indicate how this was an intentional misrepresentation upon which Manov relied to her detriment; nowhere did it allege that Manov was harmed by this practice. This allegation, therefore, was insufficient (1) because the complaint failed to allege the elements of fraud, *see Tom's Amusement Co., Inc. v. Total Vending Servs.,* 243 Ga.App. 294, 533 S.E.2d 413, 419 (2000) (explaining that when the alleged predicate act is mail fraud, the plaintiff must allege that he was a target of the scheme to defraud and that he relied to his detriment on misrepresentations made in furtherance of that scheme), and (2) because it failed to allege harm to Manov, *see Pelletier,* 921 F.2d at 1499 ("A civil RICO plaintiff must show ... that he was injured by reason of the defendant's acts of deception.").

Finally, paragraphs 111-116 of the amended complaint bore the heading "INFLUENCING WITNESSES." The thrust of this allegation was that the Nezhat defendants had persuaded a physician not to testify about the Nezhats' medical journal fraud. The physician, Dr. Harry Reich, would have testified that "Camran Nezhat could not produce patient data to verify [his] claims that he had laparoscopically treated 42 ectopic pregnancies, with no complications."[81] Assuming that Dr. Reich would have produced such testimony, we fail to comprehend its relevance here.

The final acts of racketeering bear the headings "ESTROPEL" and "EVIDENCE TAMPERING." Like the other acts of racketeering, these acts fail for want of a showing that they somehow injured Manov.

In conclusion, we concur with the district court that Count IV lacked a basis in fact. More importantly, it also lacked a legal basis. The court, therefore, had no alternative but to strike the count as frivolous.

3.

Having distilled Manov's amended complaint to its essentials, we find that it remains what it was when Manov first brought suit in the Fulton County Superior Court: a garden variety medical malpractice claim. By expanding her case to include the RICO charge and the other baseless claims discussed above, Byrne subjected himself to sanctions. *Pelletier,* 921 F.2d at 1514 (stating that sanctions are proper "(1) when a party files a pleading that has no reasonable factual basis; (2) when a party files a pleading that is based

---

[81] According to the amended complaint, the Nezhats had intimidated expert witnesses in cases brought against them by others. Once again, Manov failed to demonstrate how such conduct injured her. Moreover, these allegations are clearly nothing more than an attempt to reassert the witness intimidation arguments made by Neal in Mullen's federal court case in a motion for a protective order. The federal court denied the motion for protective order because Mullen had no evidence to support her claims. *See supra* note 36.

on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) when a party files a pleading in bad faith for an improper purpose").

Byrne's professional responsibilities in this case required him to perform a reasonably thorough and objective investigation of the facts before asserting them as the bases for these causes of action. Byrne did not speak to a single person, apart from Neal, who had actual knowledge regarding the facts that purportedly supported the fraud charges. What is more, Byrne failed to research the law. Had he done so, he would have learned that Manov's RICO claims were doomed to failure. Byrne's responsibility to act with professional judgment only after a thorough, reasonable, and objective investigation of the claims at issue was heightened (1) because Mullen's RICO claims were pending appeal of an adverse summary judgment ruling and (2) because of the extraordinary nature of the RICO allegations in this case. *See id.* at 1522 (emphasizing that "[p]articularly with regard to civil RICO claims, plaintiffs must *stop and think* before filing them"). In short, we affirm the district court's imposition of monetary sanctions against Byrne pursuant to Rule 11.[82]

Not only were sanctions justified under Rule 11, but the record is replete with instances of bad faith and dilatory tactics—thereby justifying sanctions under 28 U.S.C. § 1927 and the court's inherent power. Before he filed the case at hand, Byrne was aware of the orders issued by the judges presiding over Mullen's state and federal cases, which, collectively, labeled Neal's conduct as "deceitful and dishonest," "unethical," "malicious and harassing," and "unbecoming of an officer of the court." We find it telling that even though Byrne knew that Neal "was walking on thin ice when admitted [by the Fulton County Superior Court] pro hac vice to practice in Georgia", that the superior court had disqualified Neal from participating in Mullen's case, and that the judge in Mullen's federal court case was on the brink of doing so when Neal withdrew from the case, Byrne got involved in the case and continued to advance Neal's arguments. Moreover, shortly after

---

[82]Upon reviewing the history of this case as it was presented to the district court, including defendants' request for Rule 11 discovery and Manov's response, we find that the district court did not abuse its discretion in directing Rule 11 discovery at the outset of the case, particularly since the court envisioned that discovery would be completed in forty-five days. Due in large part to Manov's attorneys' dilatory tactics, discovery was not completed, however, until over one year later. Rule 11 sanctions "normally will be determined at the end of litigation," but "the timing of sanctions rests in the district judge's discretion." *Baker v. Alderman,* 158 F.3d 516, 523 (11th Cir.1998).

Similarly, the court properly denied Manov's July 14 and 31, 1997 motions to engage in limited Rule 11 discovery. Specifically, Manov's discovery requests sought discovery of (1) the appendectomy surgeries performed by Drs. Nezhat and the Center during 1992; (2) the Center's records of sixteen patients who had bowel resection surgeries; (3) discovery as to the authenticity of the medical credentials of Drs. Farr, Camran, and Ceana Nezhat; and (4) the depositions of the defendant doctors. In that Manov's requests were neither relevant to defendants' motions for sanctions nor related to Rule 11, the district court properly denied the motions.

filing Manov's case, Byrne was forewarned that Rule 11 sanctions were looming. Despite concerns expressed by the defendants and the court regarding the baseless allegations in the complaint, Byrne realleged and repled most of those allegations in the amended complaint, thereby forcing the defendants to respond to the same claims a second time.

Any doubt as to the meritless nature of the Georgia RICO count was removed when the Georgia Court of Appeals affirmed the summary judgment dismissal of Mullen's RICO claims. *See Mullen v. Nezhat,* 223 Ga.App. 278, 477 S.E.2d 417 (Ga.Ct.App.1996). Manov's Georgia RICO count was essentially a repleading of Mullen's RICO claims that the Fulton County Superior Court had rejected. At the time Byrne filed the complaint in this case, the summary judgment in Mullen's case had been appealed to the Georgia Court of Appeals. When Byrne filed Manov's amended complaint on September 6, 1996, the Georgia court had the appeal under advisement. Very disturbing to us is that Byrne failed to notify the district court after the Georgia Court of Appeals affirmed the summary judgment dismissal a few weeks later on October 22, 1996, effectively gutting his client's RICO claim.[83] *See Attwood v. Singletary,* 105 F.3d 610, 612 (11th Cir.1997) (explaining that in the context of establishing *in forma pauperis* status, "a party is responsible for reaffirming all contentions in papers filed before the court and informing the court of any changes in circumstances that would render a contention meritless"). Further, he neither withdrew the claim nor sought leave to file a repleader. Instead, he continued to prosecute the RICO claim with vigor until the court disposed of the claim in its February 23, 1998 order granting the defendants' motions for sanctions. Pressing on with Manov's RICO claim after the Georgia Court of Appeals' adverse decision in *Mullen* is but one of the acts of bad faith Byrne committed during the course of this litigation. Given such conduct, we would be remiss if we did not affirm the district court's imposition of monetary sanctions against Byrne under section 1927 and the court's inherent power as well as under Rule 11.

The conclusion is inescapable that, with the exception of Manov's medical malpractice claim—which the district court's sanctions order left undisturbed—Byrne filed a frivolous lawsuit, in bad faith, for the

---

[83]Defense counsel notified the district court of the court of appeals' decision on November 6, 1996. The canons of ethics required that Byrne, himself, inform the court. The Fourth Circuit described the duty of candor in *United States v. Shaffer Equipment Co.,* 11 F.3d 450, 457 (4th Cir.1993), "as that duty attendant to the attorney's role as an officer of the court with a 'continuing duty to inform the Court of any development which may conceivable affect the outcome of litigation.' ... 'Thus, attorneys are expected to bring directly before the Court all those conditions and circumstances which are relevant in a given case .... we are confident that a general duty of candor to the court exists in connection with an attorney's role as officer of the court.' " (internal citations omitted).

purpose of extorting a settlement from the defendants. As a willing participant in Neal's continuing vendetta against the Nezhats, Byrne abused the judicial process. As such, sanctions against Byrne were wholly warranted.

C.

1.

We turn now to the award of sanctions against Manov. The district court's February 23, 1998 order granted both Northside's and the Nezhats and Center's motions for sanctions against Byrne and Manov, finding them jointly and severally liable for attorneys' fees and costs, and dismissed the remaining claims (except the malpractice claim) in the amended complaint. As in the award of sanctions against Byrne, the district court cited Rule 11, 28 U.S.C. § 1927, and its inherent power as the authority for the sanctions against Manov. In this subpart, we address the monetary sanctions imposed against Manov. In subpart 3, we consider the dismissal of her claims.

While the district court did not consider Manov's conduct separately from Byrne's conduct, it thoroughly analyzed each of the counts of the amended complaint. The court concluded from its analysis that the amended complaint (apart from the malpractice claim) was filed in violation of Rule 11, because there was "no factual or legal basis for the claims" against Northside, and that "had Byrne conducted the reasonable, open-minded investigation required of him, he should have concluded that the Georgia RICO claims against the Nezhats and the Center fell beyond the scope of what could be properly pled within the confines of Rule 11."[84]

Sanctions against Manov under Rule 11 were proper if she knew or should have known that the allegations in the complaint were frivolous. *See Worldwide Primates, Inc. v. McGreal,* 26 F.3d 1089, 1093 (11th Cir.1994) (remanding the case to impose an appropriate sanction because the client pursued the claim "when it knew, or should have known, that its claim was legally and factually baseless"). That Manov was a represented party, not an attorney, does not insulate her from sanctions under Rule 11. A client may be sanctioned under Rule 11 even if the client did not sign the frivolous pleadings. *See Souran v. Travelers Ins. Co.,* 982 F.2d 1497, 1508 n. 14 (11th Cir.1993) (" 'Even though it is the attorney whose signature violates the rule, it may be appropriate under the circumstances of the case to impose a sanction on the client.' "

---

[84]The court made similar comments in disposing of Manov's other counts against the Nezhats and the Center.

(quoting Fed.R.Civ.P. 11 advisory committee's note)).  Rule 11 does not permit sanctioning a client, however, when the basis for the sanction is that the pleading was legally frivolous.[85]  *See, e.g., Schrag v. Simpson,* 141 F.3d 1185 (10th Cir.1998) (unpublished table decision) (stating "such legal matters as the frivolousness of a claim or the impropriety of a discovery request, which are 'peculiarly [within] the province of lawyers,' would not, without specific findings implicating knowing participation, support Rule 11 sanctions against a party" (citing *White v. General Motors Corp.,* 908 F.2d 675, 686 (10th Cir.1990))).  Typically, sanctions are levied against a client when he misrepresents facts in the pleadings.  *See id.*  ("[A] knowing factual misrepresentation warrants sanction.").  A client is also subject to sanctions when it is clear that he is the "mastermind" behind the frivolous case.  *See, e.g., Pelletier,* 921 F.2d 1465 (discussing the client's scheme to institute frivolous litigation to extort settlement and noting that the client was skilled in the law).

The defendants contend that Manov's deposition testimony contradicted the allegations in the complaint, that her amendments to her deposition demonstrated that she was trying to change her testimony, and that she continued to rely on Neal after she learned of his disqualification in Mullen's state court case.  Even if these allegations and other like-styled arguments set forth by the defendants are true, they do not indicate that Manov knew the complaint filed on her behalf was factually or legally baseless.  Further, there is no evidence in the record indicating that Manov provided false information to her attorneys, thereby facilitating a factually groundless complaint.  *See Calloway v. Marvel Entm't Group,* 854 F.2d 1452, 1474-75 (2d Cir.1988) (noting that a factual misrepresentation is an example of wrongful conduct for which a party may be sanctioned in addition to, or instead of, counsel) *rev'd on other grounds, Pavelic & LeFlore v. Marvel Entm't Group,* 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989);  *see also Elliott v. M/V Lois B.,* 980 F.2d 1001, 1007 (5th Cir.1993) (affirming a sanction against a party for misrepresentations in the pleadings).

There is no indication that Manov was anything but truthful in relaying to counsel facts about her surgeries and post-operative complications.  The inadequacies in the RICO and other counts in the amended complaint stemmed directly from her attorneys.  The district court recognized that Neal and Byrne, not Manov, were responsible for the frivolous complaint.  For example, consider the court's reasoning regarding the RICO claim brought against Northside:

---

[85]Fed.R.Civ.P. 11(c)(2)(A) provides that "Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2)";  subdivision (b)(2) provides "the claims, defenses, and other legal contentions therein are warranted by existing law or a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law."

[p]laintiff's counsel did not have any specific factual support for the RICO claims against Northside prior to the time the original and amended complaints were filed. This is evidenced by plaintiff's testimony, which indicates that plaintiff's counsel was the author of the RICO claim against Northside. Plaintiff testified that she was not even aware that racketeering allegations had been included in the complaint. Plaintiff admitted that she did not understand the meaning of "racketeering." Plaintiff has no personal knowledge to support the allegations that Northside knowingly permitted the Nezhats to perform "unnecessary, unwarranted, non-consensual and experimental surgeries" on patients for Northside's own benefit. Further, plaintiff has no personal knowledge that any nurses at Northside committed battery. Further, plaintiff admits that no Northside agent, employee or representative ever touched her or performed treatment on her without consent. Finally, plaintiff admits that she has no personal knowledge of any criminal activity committed by an officer, board member, or other individual in a managerial capacity at Northside.... It was the decision of plaintiff's counsel in this matter to file this action and to radically expand the scope of the allegations far beyond those pled by plaintiff's original attorney.

Similarly, the court stated the following regarding the Nezhats and the Center's motion for sanctions:

Byrne did not have any evidence to support a claim against the Nezhats for RICO. Byrne did not talk to a single person—and apparently did not even have second hand knowledge through Neal—of anyone who had actual knowledge regarding the matters at issue here who had ventured the view that there were facts to support the charge of fraud. The fact that the alleged "scheme" is unsupported by any evidence should have led reasonable counsel to the conclusion that no scheme existed. It should also have caused Byrne to be put on notice that further inquiry was required, particularly in light of the past adjudications and demonstration of Neal's past behavior.... Therefore, had Byrne conducted a reasonable, objective and open-minded investigation, ... he should have concluded that the claim for Georgia RICO fell beyond the scope of what could be properly pled within the confines of Rule 11. It was the decision of plaintiff's counsel in this matter to file this action and to radically expand the scope of the allegation far beyond those pled by plaintiff's original attorney, in order to take advantage of what Byrne had hoped would be more expansive discovery, among other reasons. Further, because plaintiff and plaintiff's counsel have acted with bad faith[86] in pursuing this RICO claim against the Nezhats, this court is authorized pursuant to 28 U.S.C. § 1927 and the inherent power of this court to GRANT defendants' motion for sanctions. Accordingly, the defendants have complied with all of the appropriate requirements in order to establish their entitlement to Rule 11 sanctions.

Implicit in the district court's reasoning is the understanding that Manov's attorneys, not Manov, were responsible for the frivolous claims and pleadings. Accordingly, insofar as the monetary sanctions levied against Manov were based on the court's authority under Rule 11, they cannot be upheld.

The district court's failure to specify her sanctionable conduct is not what gives rise to our conclusion that the court abused its discretion in imposing monetary sanctions on Manov under Rule 11. *See, e.g., White,* 908 F.2d at 681(explaining that "[w]hile the court's method of imposing sanctions was not optimal, neither was it an abuse of discretion, [because t]he court's findings and conclusions, which we have extensively quoted, were detailed enough to assist in appellate review, help assure the litigants [ ] that the decision was the product of thoughtful deliberation, and [ ] enhance[ ] the deterrent effect of the ruling.") (final alteration in original); *Independent Fire Ins. Co. v. Lea,* 979 F.2d 377, 379 (5th Cir.1992) (noting that the trial court

---

[86]We address the court's finding of bad faith on the part of Manov in Part III.C.2, *supra.*

"clearly identified the many grounds and circumstances on which it felt that actions taken by [one of the clients] failed to satisfy the requirements of Rule 11; but no where did the Trial Court identify any similar actions as having been taken by [the other clients]"). The reason we cannot affirm the Rule 11 monetary sanctions against Manov is that to do so based on the district court's reasoning or the evidence in the record before us would be to impose strict or vicarious liability, neither of which is warranted under Rule 11. *See Independent Fire Ins. Co. v. Lea,* 979 F.2d at 379 ("There is nothing in the express language of Rule 11 that all parties at interest on a particular side of a given lawsuit shall be subject to sanctions on a pro rata or joint and several liability or *in solido* basis; and we do not think that the basic policies of 'deterrence and education' behind Rule 11 require an interpretation of the Rule which creates such forms of vicarious liability."); *Southern Leasing Partners, Ltd. v. McMullan,* 801 F.2d 783, 789 (5th Cir.1986) ("Rule 11 is not a rule of strict liability.").

The court expressly stated that "it was the decision of plaintiff's counsel to expand this litigation beyond the scope of that pled by her original attorney in state court"; as such, it is clear that Manov was not involved in the management of her case or the decisions that resulted in the actions the court found improper under Rule 11. *See Independent Fire Ins. Co.,* 979 F.2d at 379 (explaining that "[w]hile Rule 11 ... does contemplate that sanctions can be levied against a 'represented party', we are constrained to hold under the facts of this case that the 'represented party' against which sanctions are levied must be a party who had some direct personal involvement in the management of the litigation and/or the decisions that resulted in the actions which the court finds improper under Rule 11"). Moreover, the court's statements demonstrate that, unlike the client in *Pelletier,* 921 F.2d 1465, Manov was not the mastermind behind the frivolous litigation. *See also In re Big Rapids Mall Assocs.,* 98 F.3d 926, 932 (6th Cir.1996).[87] In sum, because "Rule 11 directs that the sanction should fall upon the individual responsible for the filing of the offending document," *Chevron, USA, Inc. v. Hand,* 763 F.2d 1184, 1187 (10th Cir.1985), we cannot affirm the Rule 11 monetary

---

[87]In *Big Rapids,* the Sixth Circuit reviewed the bankruptcy court's conclusion "that 'the attorneys and clients shared responsibility for the litigation strategy.' " 98 F.3d at 932. As in the instant case, the bankruptcy court in *Big Rapids* imposed sanctions jointly and severally on the clients and the attorneys. While in the instant case the court did not detail the *client's* (Manov's) conduct and the court in *Big Rapids* failed to detail the *attorneys'* conduct, this difference is of no moment. *Big Rapids* stands for the general proposition that Rule 11 is not a rule of vicarious liability. *See id.* ("Without any findings to support the imposition of sanctions on appellants, the bankruptcy ruling amounts to vicarious liability on the part of appellants for the perceived unreliability of their clients' testimony."). Like the court in *Big Rapids,* we find "no facts to support a conclusion of 'shared responsibility' " to justify the award of Rule 11 sanctions against Manov. *Id.*

sanctions against Manov.[88]

2.

Although we find that monetary sanctions against Manov were not justified under Rule 11, the award of these sanctions may still be affirmed if the sanctions were proper under the court's inherent power.[89] As explained *supra* Part III.B.1, a federal court may resort to its inherent power to sanction an attorney or a party for bad faith conduct. "A finding of bad faith is warranted where an attorney [or a client] knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Barnes,* 158 F.3d at 1214 (11th Cir.1998) (citing *Primus Automotive Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 649 (9th Cir.1997)). In its February 23, 1998 sanctions order, the district court discussed each defendant's motion separately but it reached virtually the same legal conclusion: "because plaintiff and plaintiff's counsel have acted with bad faith in pursuing [these] claim[s], this court is authorized pursuant to 28 U.S.C. § 1927 and the inherent power of this court to grant ... defendants' motion for sanctions." Because a finding of bad faith is "the key to unlocking the inherent power," we consider each of the district court's findings that Manov acted in bad faith.

a.

In granting Northside's motion for sanctions, the district court repeatedly emphasized that

---

[88] A line of cases holds that dismissal of a case for an attorney's neglect does not unfairly prejudice the client because the client is responsible for the actions of his attorney. These cases have been used to support the general proposition that a client is liable for the actions of his attorney. Most case law in this area stems from *Link v. Wabash R.R. Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962), in which the district court dismissed the client's case because the client's attorney failed to attend a scheduled pretrial conference. *Link* reasoned:

> [T]here is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of his freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of this lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney."

*Id.* at 633-34, 82 S.Ct. at 1390 (citation omitted). We agree with the Eighth Circuit that "[t]he principle enunciated by the Supreme Court [in *Link* ] simply does not apply in a Rule 11 sanction context. Otherwise every award against an attorney under Rule 11 could also be assessed against the client." *Kirk Capital Corp. v. Bailey,* 16 F.3d 1485, 1492 (8th Cir.1994).

[89] We note that 28 U.S.C. § 1927 does not authorize sanctioning a client, such as Manov. We presume, therefore, that the district court relied on the authority derived from its inherent power to sanction Manov and the authority of both section 1927 and its inherent power to sanction Byrne.

Plaintiff's counsel did not have any specific factual support for the RICO claims against Northside prior to the time the original and amended complaints were filed. This is evidenced by plaintiff's testimony, which indicates that plaintiff's counsel was the author of the RICO claim against Northside. Plaintiff testified that she was not even aware that racketeering allegations had been included in the complaint. Plaintiff also admitted that she did not understand the meaning of "racketeering." ... It was the decision of plaintiff's counsel in this matter to file this action and to radically expand the scope of the allegations far beyond those pled by plaintiff's original attorney.

The district court went on to support its finding of bad faith by listing the following egregious acts: (1) plaintiff's counsel brought a negligence claim one-and-a-half years after the statute of limitations had run; (2) plaintiff's counsel argued that the statute was tolled as a result of Northside's fraudulent acts even though the complaint failed to allege any fraudulent acts on the part of Northside; (3) plaintiff's counsel had no evidence that Northside had engaged in any racketeering activity; (4) plaintiff was not aware at the time of filing that her counsel had alleged a RICO claim; (5) plaintiff's counsel repled and repeated the frivolous arguments in the amended complaint, forcing Northside to respond to the amended complaint and renew its motion to dismiss—in this regard plaintiff and plaintiffs's counsel unreasonably and vexatiously multiplied this action. Despite its cognizance that plaintiff's counsel, not plaintiff, were behind both the baseless RICO allegations and the untimely filing of the negligence claim against Northside, the district court summarily stated that "Northside has shown that plaintiff and plaintiff's counsel have acted with bad faith so as to recover sanctions pursuant to section 1927 and the inherent power of the court." The court concluded that "sanctions are proper under the court's inherent power because plaintiff and plaintiff's counsel have abused the judicial process by using the court as a vehicle to continue Neal's pursuit of the Nezhats."

b.

The district court followed similar reasoning in granting the Nezhats and the Center's motion for sanctions. Regarding the Georgia RICO claim, the district court stated: "It was the decision of plaintiff's counsel in this matter to file this action and to radically expand the scope of the allegations far beyond those pled by plaintiff's original attorney, in order to take advantage of what Byrne had hoped would be more expansive discovery, among other reasons." After emphasizing that it was plaintiff's counsel who expanded the scope of this litigation, the district court stated that plaintiff's counsel and plaintiff acted in bad faith in pursuing the RICO claim against the Nezhats. Therefore, according to the court, it was authorized under 28 U.S.C. § 1927 and the inherent power of the court to sanction plaintiff and her counsel.

Similarly, regarding Manov's battery count it stated:

had Byrne conducted a reasonable, objective and open-minded investigation required by the professional responsibility of an attorney, counsel should have concluded that the claim of battery fell beyond the scope of what could be properly pled within the confines of Rule 11. Further, it was

the decision of plaintiff's counsel in this matter to file this action and to radically expand the scope of the allegation far beyond those pled by plaintiff's original attorney. Finally because plaintiff and plaintiff's counsel have acted with bad faith in pursuing this battery claim against Camran, Farr and Ceana Nezhat, this court is authorized pursuant to 28 U.S.C. § 1927 and the inherent power of this court to grant ... defendants' motion for sanctions.

Again, regarding Manov's fraud count, the district court stated:

[n]o evidence has been presented that the Nezhats made fraudulent misrepresentations to plaintiff or that the Nezhats concealed material information. Thus, plaintiff's counsel has no reasonable factual bases upon which to bring a claim against the Nezhats for fraud. Further, plaintiff's fraud claim is objectively frivolous because counsel has no evidence of fraudulent activity on behalf of the Nezhats. Finally, because plaintiff and plaintiffs's counsel have acted with bad faith in pursuing this fraud claim against Camran, Farr and Ceana Nezhat, this court is authorized pursuant to 18 U.S.C. § 1927 and the inherent power of this court to grant ... defendants' motion for sanctions.

c.

The above analysis of the asserted bases for sanctioning Manov evidences a distinct and erroneous trend in the district court's reasoning. As a sanction against Manov and Byrne, the court awarded attorney's fees and dismissed all but the malpractice count. To justify these sanctions, the court cited Byrne's conduct from which it inferred bad faith. Then, the court summarily stated that both Byrne and Manov acted in bad faith. To support its findings of bad faith and otherwise sanctionable conduct, the court impermissibly relied solely on the actions of counsel. *See Primus Automotive Financial Servs. Inc.,* 115 F.3d at 650 (citing *Martin v. Brown,* 63 F.3d 1252, 1256 (3d Cir.1995) (explaining that "any sanctions imposed against [an attorney] should be based solely on his 'own improper conduct without considering the conduct of the parties or any other attorney' ") (quoting *Martin v. Brown,* 63 F.3d 1252, 1265 (3d Cir.1995))). Sanctionable conduct by a party's counsel does not necessarily parlay into sanctionable conduct by a party. *See Donaldson v. Clark,* 819 F.2d 1551, 1557 n. 6 (11th Cir.1987) (explaining that it is advisable to avoid a sanction that penalizes the parties for the offenses of their counsel); *M.E.N. Co. v. Control Fluidics, Inc.,* 834 F.2d 869, 873 (10th Cir.1987) ("Where sanctions are concerned, ... we have cautioned that '[i]f the fault lies with the attorneys, that is where the impact of the sanction should be lodged.' " (citation omitted)).

While bad faith is the "key to unlocking the court's inherent power," *Barnes,* 158 F.3d at 1214, a court must do more than conclude that a party acted in bad faith; it should make specific findings as to the party's conduct that warrants sanctions.[90] This is not a case in which sanctions can be upheld despite the lack

---

[90]The Sixth Circuit explained the ideal inquiry undertaken by a district court when deciding to implement sanctions:

[W]hat information about the client's business did the attorneys have? Was the information verified? How involved had these attorneys been in their client's business?

of specificity in the district court's order. *See generally Barber v. Int'l Bhd.,* 778 F.2d 750, 756 (11th Cir.1985) (" 'In some cases if [the trial court] fails to make a finding on a particular fact it has been assumed that ... [it] impliedly made a finding consistent with [the] general finding.' " (quoting Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2579 at 712-13 (1971)); *Clinkenbeard v. Central S.W. Oil Corp.,* 526 F.2d 649 (5th Cir.1976)). Unless the evidence on the issue of bad faith is uncontroverted, a district court should examine a party's conduct and make findings on that issue.

d.

Nothing in the record indicates that Manov knew that a baseless claim had been brought on her behalf or that she was pursuing the Nezhats for a harassing or other impermissible purpose. *See Barnes,* 158 F.3d at 1214 ("A finding of bad faith is warranted where an attorney [or a client] knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order."). In fact, the minimal findings regarding Manov in the February 23, 1998 sanctions order directly undermined any conclusion of bad faith on her part. The court stated that "plaintiff testified that she was not even aware that racketeering allegations had been included in the complaint. Plaintiff also admitted that she did not understand the meaning of 'racketeering.' ... It was the decision of plaintiff's counsel in this matter to file this action and to radically expand the scope of the allegations far beyond those pled by plaintiff's original attorney." The district court's statement that Manov was not even aware that racketeering allegations had

---

For how long? Were other professionals, such as accountants, or bankers consulted? What independent investigation, if any, did the attorneys undertake prior to the filing? What did their clients tell them? Were they justified in believing what their clients told them? Did a time problem exist when a decision to file was made? What was the business (and legal) sophistication of the clients and the attorneys? These along with a myriad of other factual details would be crucial to have in hand before determining whether the action taken or not taken by the attorneys prior to filing ... was or was not reasonable.

*In re Big Rapids Mall Assocs.,* 98 F.3d at 930. In the case before us, the district court conducted this type of extensive review of Byrne's pre-filing investigation. As to Manov, however, the district court's analysis is flawed in that

[t]he court merely stated that "misrepresentations" existed in various pleadings made to "improperly or abusively delay and hinder the [defendant]." ... The court did not identify these "misrepresentations" nor the pleadings containing them, and no facts in the record exist to reflect that appellants knew or should have known that there were any misrepresentations.

*Id.*

been included in the complaint precludes the conclusion that she knowingly or recklessly filed a frivolous claim. As such, the court's findings that Manov acted in bad faith are clearly erroneous.

Not only does the court's own statement undermine a conclusion of bad faith, but its failure to specify Manov's sanctionable conduct renders us unable to affirm. This was brought to the court's attention in plaintiff's March 12, 1999 Response to Submission of Nezhat Defendants and Northside Hospital Regarding *Baker v. Alderman,* 158 F.3d 516 (11th Cir.1998).[91] Manov argued that the court never made a finding that she herself participated in any wrongdoing. The court acknowledged plaintiff's argument in its June 24, 1999 order setting the amount of monetary sanctions to be awarded.

> [T]he court made specific findings regarding plaintiff's personal wrongdoing in its February 23, 1998 sanctions order. Not only does it appear that plaintiff has made several false assertions in affidavits, depositions and sworn statements filed with the court, see Nezhat Defendants Proposed Findings of Fact [docket number 109-11], pages 151-76, but incredibly, plaintiff continues to rely on attorney Neal for counsel despite this court's specific admonitions regarding his involvement in this litigation. Irrespective of the overwhelming evidence of unprofessional conduct by Neal, plaintiff has never disavowed either her relationship with him or his conduct.

These above quoted statements demonstrate that the court considered plaintiff's argument and rejected it. The statements also constitute an attempt to clarify or issue the following findings: (1) plaintiff made false statements in documents filed with the court and (2) plaintiff continued to rely on Neal after he was barred from the case. Finally, the court's statements demonstrate that it relied on a portion of the Defendants' Proposed Findings of Facts.

e.

At first glance, it seems as if the district court, in its June 24, 1999 order, "cured" the failure of its February 23, 1998 sanctions order to cite Manov's sanctionable conduct. We must, nonetheless, reverse because the findings set forth in the June 24 order are irrelevant and could not serve as a basis for sanctions. Consider the finding that Manov made several false assertions in affidavits, depositions, and sworn statements filed with the court. Even if we accept this finding as true, false statements alone do not indicate bad faith. Without a "smoking gun" statement from the plaintiff, i.e., "I know my claim is frivolous and I am pursuing this claim to harass the defendants," a district court makes a determination of bad faith by drawing inferences

---

[91]*See supra* note 53, explaining that *Baker* requires a court to consider a party's ability to pay when fashioning an award of monetary sanctions. We note that in her March 9, 1998 motion for reconsideration of the court's order awarding sanctions, Manov did not argue that the district court failed to specify her misconduct. The court denied her motion on June 1, 1998. Manov's argument regarding the district court's failure to specify wrongdoing on her part was not brought to the court's attention until her March 5, 1999 response to the court's February 17, 1999 order directing Manov and Byrne to comply with *Baker* by submitting financial information on their respective abilities to pay monetary sanctions.

from the conduct before it. Standing alone, a false or inconsistent statement in a deposition does not compel the conclusion of bad faith. A false statement can be evidence of bad faith, if, for instance, there is other evidence in the record indicating that the statement was made for a harassing or frivolous purpose. The record in this case, however, does not yield the inference that Manov knew her claim was frivolous or that she sought to harass the Nezhats. For instance, in their Proposed Findings of Fact, the defendants asserted (and the district court implicitly adopted)[92] that Manov was happy with the Nezhats after her surgery because her pain had subsided. As defendants pointed out, an underlying premise of this case is that she was unhappy with the care she received from the Nezhats. Even if viewed as "false," this latter statement is not evidence that Manov knew her claim was frivolous and therefore acted in bad faith in pursuing the Nezhats.[93]

f.

The district court also found that Manov acted in bad faith because she continued to rely on Neal despite the court's specific admonition regarding his involvement in the litigation.[94] Once again, standing alone, the finding that Manov relied on Neal does not compel the inference that she knew her claim was frivolous or that she was pursuing her claim for a harassing purpose.[95] In her deposition, Manov indicated

---

[92]In its June 24, 1999 order, the district court explicitly refers to pages 151-76 of the Defendants' Proposed Findings of Fact to support its finding that Manov made false assertions in statements filed with the court.

[93]That Manov did not knowingly make false assertions to further this baseless litigation is evident from the following example cited in the Defendants' Proposed Findings of Fact. One aspect of her lawyers' theory of the case is that in their medical journal articles, the Nezhats concealed complications, such as those in Manov's and Mullen's surgeries. At her lawyers' behest, Manov executed an affidavit stating that the Nezhats reported an absence of complications in 100 consecutive appendectomies. Her counsel prepared the affidavit which stated, "They must have forgotten about me." At her deposition, counsel for the Nezhats informed Manov that the article claiming that the Drs. Nezhat had encountered no complications in their last 100 appendectomies was published one year before her surgery. Upon learning of this discrepancy, she said she was unaware of the date of the article, acknowledged that it was impossible for her to be included in the article, and admitted that this argument should not have been presented to the court. Rather than demonstrating a bad faith attempt to pursue frivolous litigation, this example demonstrates that Manov was unaware of the frivolous nature of the claims made on her behalf and that she was not pursuing the Nezhats in bad faith.

[94]Given Neal's repeated unethical and unprofessional behavior, the district court took the proper course in barring him from "participating in any form or fashion" in the case.

[95]This case is unlike *Baker,* 158 F.3d 516 (a case decided under the pre-1993 amendments to Rule 11), in which the plaintiff argued that he should not have been sanctioned because he relied on the advice of his attorney and never signed any papers filed with the court. In *Baker,* we noted that while the district court stated that "ignorance of the law is no excuse," it did not respond to plaintiff's argument that he relied on the advice of counsel. *Id.* at 526. We affirmed the district court based on its findings that "Plaintiff should have believed the pleadings he filed were not well-grounded in facts and law." *Id.* The plaintiff had also read important documents filed by the defendants informing him his case was frivolous.

that she wanted Neal to represent her because she believed that he cared about her, that he listened to her, and that he had her best interests in mind. She stated, "I think from my dealing with him he's a very caring person, genuine and trying to do the right thing for people." This demonstrates that Manov relied on Neal because he was nice to her rather than because she wanted to join a vexatious pursuit of the Nezhats. Indeed, her deposition revealed that she did not believe that whatever the Nezhats had done was so bad that they should be driven out of business. She expressly stated that ruining the Nezhats was not the goal or purpose of her suit. Even the Defendants' Proposed Findings of Fact, upon which the court relied, stated that Manov was nothing but a pawn in Neal's zealous pursuit against the Nezhats.[96] Despite this clear evidence regarding Manov's role in this litigation, the district court repeatedly concluded that Manov acted in bad faith.

g.

Moreover, instead of supporting the conclusion of bad faith, the Defendants' Proposed Findings of Fact, upon which the district court relied, further evidence that Manov was unaware of the frivolous and vexatious nature of this litigation. Consider the following statements from the Defendants' Proposed Findings of Fact: (1) none of Manov's lawyers informed her that Neal had been disqualified from Mullen's case in Fulton County Court or that Neal had been found unethical, malicious, relentless, harassing, and to be conducting a vendetta against the Nezhats; (2) in Manov's April 27, 1998 deposition, she stated she was unaware that the district court had ordered Neal not to participate "in any form or fashion in this case";[97] (3) Manov was never shown a copy of the complaint before it was filed in the district court; (4) Manov's lawyers told her that the racketeering allegations would be supported by Mullen's allegations—no one informed Manov that Mullen's allegations had been dismissed on summary judgment and that the Georgia Court of Appeals affirmed the dismissal; (5) Manov had not been told that the medical journal allegations in her complaint had been dismissed on summary judgment in Mullen's state court case; (6) Manov's lawyers did not inform her that the witness intimidation claims made in her case had been rejected in Mullen's federal

Moreover, the plaintiff knew that "the Second District Court of Appeal[ ] ruled on [his case and that] the Florida Supreme Court denied hearing, and so did [the federal district court] in its order granting summary judgment to Defendants." *Id.*

[96]Unlike *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), in which the district court found that the sanctioned plaintiff was the strategist behind the fraud committed on the court, in this case the district court did not find, and the record does not demonstrate, that Manov was the mastermind behind the baseless claims.

[97]During this deposition, the parties telephoned the district court, informing it that Manov had testified that she had not been shown the court's order instructing Neal not to participate in the case.

court case;  (7) Manov did not know that Neal never appeared as counsel of record in her case.

It is clear from the record—indeed, from the Defendants' Proposed Findings of Fact upon which the district court relied—that Manov's lawyers did not inform her of developments in her case.[98]  Because she was kept uninformed about her case, it is hard to say that she knowingly filed and continued to prosecute the case in bad faith.  Finally, we emphasize that even if the limited findings in the June 24, 1999 sanctions order yield an inference of bad faith, this inference is undermined by the court's only findings as to Manov in the February 23, 1998 sanctions order—the findings that Manov was unaware of the RICO allegations pled on her behalf and that she did not know the meaning of the term "racketeering."

3.

Although monetary sanctions against Manov pursuant to Rule 11 and the court's inherent power were not proper, the court's dismissal of all counts except her malpractice claim was justified.  As noted in Part I of this opinion, the district court entered its sanctions orders without explicitly passing on the sufficiency of the Nezhats and the Center's affirmative defense of failure to state a claim for relief.  The court determined that some of the counts of the complaint—Count IV, Georgia RICO and Count II, fraud—lacked factual support, and that one count—battery—should be dismissed because the deposition testimony of record, coupled with the count's allegations, demonstrated that the count was both legally and factually frivolous. That the court considered the adequacy, as well as the frivolity, of Manov's claims is evident from its decision not to dismiss the malpractice claim, as it was pled with a legal and factual basis.  Moreover, our review of the complaint, particularly the RICO count, reveals that Manov's claims are insufficient as a matter of law, *see supra* Part III.B.2.c.  As such, the court did not err in dismissing all but the malpractice count of the complaint.[99]

---

[98]In *M.E.N. Co.,* 834 F.2d at 873-74, the Tenth Circuit remanded the case for specific findings as to the attorneys' misconduct, and advised the district court that if it found that the attorneys failed to communicate with their clients during the course of litigation, particularly if they failed to inform their clients of critical matters in court orders, the district court should consider discipline and possible referral to state licensing authorities.

[99]While in their answer the Nezhats and the Center asserted as an affirmative defense that the complaint failed to state a claim for relief, we recognize that such defense was not before the court when it entered the first sanctions order.  That is, these defendants had not moved the court pursuant to Fed.R.Civ.P. 12(c) for a judgment on the pleadings, which would have required the court, in light of the above affirmative defense, to determine whether any of the counts were legally cognizable.  This is of no moment, however, because a court may dismiss a complaint *sua sponte* assuming the court exercises caution.  *See Clorox Co. v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 30 (1st Cir.2000) (stating that "it is occasionally appropriate for a district court to note the inadequacy of the complaint and, on its own initiative, dismiss the complaint [,] a court may not do so without at least giving plaintiffs notice of

IV.

This case began in the Fulton County Superior court as an ordinary medical malpractice case. When the plaintiff switched lawyers, so did the scope and tenor of the case. Instead of simple medical malpractice, the case burgeoned into a broad-based RICO prosecution. The plaintiff's new lawyers were determined that the defendants would either settle or suffer professional ruin. They used every tool they could conceive of to extort settlement: going to the press, the United States Attorney, and even the FBI. The defendants refused to cave in. The case dragged on for three and a half years ending in the dismissal of the plaintiff's claims—including her malpractice claim—and the imposition of close to $400,000 in monetary sanctions against the plaintiff and one of her lawyers. One must ask, "how could it take so long and cost so much to dispose of such a case?" We would be remiss if we concluded this opinion without explaining how this could happen, and, more importantly, how it could have been avoided.

A.

Manov's original complaint contained 78 pages, 299 paragraphs, 139 subparagraphs, and nine counts. Counts II through IX incorporated by reference all antecedent paragraphs, such that Count IX was an amalgamation of everything in the complaint. To say that the allegations of the complaint were vague and ambiguous—leaving the reader to guess at precisely what the plaintiff was claiming—is an understatement.[100] Nonetheless, the district court treated Manov's complaint as having stated, in each count, a claim for relief. Manov's amended complaint was just as vague and ambiguous as the initial complaint. The court, however, continued to treat Manov's claims against the Nezhats and the Center as legally cognizable and sufficiently pled, even after it granted Northside's motion to dismiss Count III and struck Northside from Count IV. In fact, the claims against the Nezhats and the Center remained undisturbed for two years, until the court passed

_____

the proposed action and affording them an opportunity to address the issue.") (alteration in original)(internal citation omitted). Given the numerous hearings, motions, and voluminous memoranda filed by both sides regarding the adequacy of the complaint, we find that the parties knew the court was considering the complaint's sufficiency. Even if the parties did not have such knowledge, we could still find that the court properly treated the claims as if ruling on a Rule 12(c) motion because reversal of a *sua sponte* dismissal without notice may not be "mandated if amendment [of the complaint] would be futile or if it is patently obvious that the plaintiff could not prevail." *Wyatt v. City of Boston,* 35 F.3d 13, 15 n. 1 (1st Cir.1994). It is patently obvious, given the legal and factual inadequacies of the complaint, that Manov could not prevail. Accordingly, reversal of the district court's order dismissing the claims is not warranted.

[100]For example, and as our previous discussion reveals, neither the federal nor the state RICO count of Manov's initial complaint cited the provision(s) of the RICO statute on which the count was based. The amended complaint, which contained only the Georgia RICO count, had the same deficiency.

on their sufficiency in granting the defendants' motions for sanctions.[101]

B.

Rule 12(e) of the Federal Rules of Civil Procedure states:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired. If the motion is granted and the order of the court is not obeyed ... the court may strike the pleading to which the motion was directed or make such order as it deems just.

The complaints in this case were "so vague and ambiguous that [the defendants] [could] not reasonably be required to frame a responsive pleading." None of the defendants, however, moved the court to order the plaintiff to file a more definite statement; instead, the defendants simply answered the complaints. In their answers, they responded to the numbered paragraphs of the complaints, admitting or denying the allegations thereof, and then asserted a variety of affirmative defenses. With minor exception, none of the affirmative defenses responded to a particular count of the complaint; rather, the affirmative defenses addressed the complaint as a whole, as if each count was like every other count. Northside's answer to the amended complaint asserted twenty-six affirmative defenses, most of which were pled in one sentence. They included "estoppel," "statute of limitations," "failure to state a claim for relief," "consent," "accord and satisfaction," "payment and release," "waiver," that the Georgia RICO statute is "unconstitutionally vague," and that plaintiff's claim for punitive damages "violate[ed] the Eighth, Thirteenth, and Fourteenth Amendments of the Constitution of the United States of America." The Nezhats and the Center's answer was pled in a similar fashion; their affirmative defenses totaled fourteen and mimicked many of Northside's defenses.

Although the defendants' affirmative defenses were comprehensible in a literal sense, because they addressed the amended complaint as a whole they were, as a practical matter, as vague and ambiguous as the amended complaint. By eschewing a Rule 12(e) motion for a more definite statement and choosing to answer the amended complaint in this fashion, the defendants in effect joined the plaintiff in setting the stage for the immense and unnecessary expenditure of resources evident in this case.[102]

We have labeled pleadings such as Manov's complaints and the defendants' answers "shotgun"

---

[101]Manov filed her initial complaint on January 12, 1996. She filed her amended complaint on September 6, 1996. The district court issued its first sanctions order on February 23, 1998.

[102]The parties wasted their own resources as well as the resources of the district court and this court.

pleadings. *See, e.g., Magluta v. Samples,* 256 F.3d 1282 (11th Cir.2001); *Ebrahimi v. City of Huntsville Bd. of Ed.,* 114 F.3d 162, 168 (11th Cir.1997) (per curiam); *Cesnik v. Edgewood Baptist Church,* 88 F.3d 902, 905 (11th Cir.1996); *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Comm. Coll.,* 77 F.3d 364, 366-67 (11th Cir.1996); *Pelletier v. Zweifel,* 921 F.2d 1465, 1517-18 (11th Cir.1991); *Fullman v. Graddick,* 739 F.2d 553, 557 (11th Cir.1984). Unless the court requires a repleader—under Rule 12(e) or on its own initiative—a shotgun complaint leads to a shotgun answer. Where, as here, each count incorporates every antecedent allegation by reference, the defendant's affirmative defenses are not likely to respond to a particular cause of action but, instead, to the complaint as a whole. Such disjointed pleadings make it difficult, if not impossible, to set the boundaries for discovery. Hence, discovery disputes are inevitable.[103] Resolving them can be time-consuming. If the court does not intervene and require the parties to narrow the issues, the discovery disputes continue unabated—until a motion for summary judgment or a pretrial conference brings them to a halt. At that point, the court is confronted with the time-consuming tasks it avoided earlier—rearranging the pleadings and discerning whether the plaintiff has stated a claim, or claims, for relief, and whether the defendant's affirmative defenses are legally sufficient.[104] If the court performs these tasks, it will have to strike all of the allegations of the complaint and answer that are insufficient, immaterial, or impertinent[105]—so that, when the tasks are finished, the complaint consists of a "short and plain statement of the claim," or claims, for relief, and the answer states "in short and plain terms the [defendant]'s defenses to each claim asserted." Fed.R.Civ.P. 8(a) and (b).[106]

Unfortunately, many district judges opt to do nothing; they simply let the case proceed to trial on the pleadings as they stand. They do so for two reasons. First, given a day-certain trial date, the case may settle. Second, narrowing the issues by effectively rearranging the pleadings in the style required by Rules

---

[103]Lawyers being compensated by the hour may have little incentive to curb the use of shotgun pleadings and the discovery disputes that inevitably result.

[104]In short, the court must do what the litigants have not done as required by Rules 8 and 10(b) of the Federal Rules of Civil Procedure.

[105]Fed.R.Civ.P. 12(f), which is a codification of part of the district court's inherent power to manage pending litigation, states, in pertinent part: "[u]pon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

[106]It is obvious that the "judicial work that results from shotgun pleadings is far more time consuming than the work required up front to prevent the case from proceeding beyond the pleadings until the issues are reasonably well defined." *Johnson Enter. v. FPL Group, Inc.,* 162 F.3d 1290, 1333 (11th Cir.1998).

8 and 10, and then striking the insufficient claims and defenses, may render superfluous much of the parties' discovery. If that happens, the judge is effectively reversing his earlier, albeit tacit, position that the pleadings were legally sufficient, and saying to the parties: "You have needlessly expended time and money, and I allowed it." Consequently, it is unlikely that the issues will be narrowed to the point that only the meritorious claims and defenses remain. If the case does not settle, it proceeds to trial with the issues unnarrowed. There, the potential for error—and an unjust result and a subsequent appeal—is considerable.

Litigating a case framed by shotgun pleadings obviously harms one or both of the parties.[107] Why, then, would a lawyer engage in shotgun pleading? Plaintiffs file shotgun complaints and include frivolous claims to extort the settlement of a meritorious claim; worse yet, they file shotgun complaints to extort the settlement of unmeritorious claims, as demonstrated in this case. Extortion cuts both ways. Depending on his financial resources, a defendant may use a shotgun answer to obtain a settlement that waters down a meritorious claim. In either situation, the extorted settlement provides a financial benefit to the "prevailing" party and a windfall in the form of fees for the "prevailing" lawyer.[108]

In addition to watering down the rights of the parties to have valid claims litigated efficiently—whether the plaintiff's or the defendant's—shotgun pleadings wreak havoc on the judicial system. Cases framed by shotgun pleadings consume an inordinate amount of a court's time. As a result, justice is delayed, if not denied, for litigants who are standing in the queue waiting to be heard. Their impression of the court's ability to take care of its business can hardly be favorable. As the public becomes aware of the harm suffered by the victims of shotgun pleading, it, too, cannot help but lose respect for the system. Moreover, the consequence of a trial court's inability, or apparent unwillingness, to halt the use of shotgun pleadings may prompt parties to turn to non-judicial forums to resolve their disputes.[109]

Shotgun pleadings, if tolerated, harm the court by impeding its ability to administer justice. The time

---

[107]In a case framed by shotgun pleadings, the transaction costs are disproportionately high. Such costs may cause the plaintiff or the defendant to settle an open and shut claim or defense, thereby watering down the litigant's rights. And, if the case proceeds to trial without a careful delineation of the issues, the potential for an unjust result is heightened, further diluting the litigant's rights.

[108]It goes without saying that a plaintiff with a solid case does not need to file a shotgun complaint. By the same token, a defendant with a strong defense need not file a shotgun answer.

[109]Another consequence of judicial tolerance of shotgun pleadings is that the transaction costs generated by such pleadings may effectively close the court house doors to some citizens whose rights can be enforced only in a United States district court.

a court spends managing litigation framed by shotgun pleadings should be devoted to other cases waiting to be heard. "[W]ast[ing] scarce judicial and parajudicial resources ... impedes the due administration of justice" and, in a very real sense, amounts to obstruction of justice. *United States v. Silverman,* 745 F.2d 1386,1395 (11th Cir.1984). *See also United States v. Essex,* 407 F.2d 214, 218 (6th Cir.1969). Although obstruction of justice is typically discussed in the context of criminal contempt, the concept informs the rules of law—both substantive and procedural—that have been devised to protect the courts and litigants (and therefore the public) from abusive litigation tactics, like shotgun pleadings.[110] If use of an abusive tactic is

---

[110]From the time they were established, Article III courts have had an assortment of "inherent powers," all derived from the common law. While never specified in the Constitution or legislative enactments, these powers assisted courts in exercising their enumerated judicial powers, such as managing their cases and courtrooms. *See United States v. Kouri-Perez,* 187 F.3d 1, 7 (1st Cir.1999). "These implicit powers include the judicial authority to sanction counsel for litigation abuses which threaten to ... disrupt its efficient management of the proceedings. *Chambers,* 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1990) (noting that inherent district court powers include the authority to 'control admission to its bar and to discipline attorneys who appear before it'); *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) ('The power of a court over members of its bar is at least as great as its authority over litigants.')." *Id.*

Some of these inherent powers are made explicit by the enactment of procedural, disciplinary, and ethical rules. *Id.* For instance, 18 U.S.C. § 401 codified a court's implicit power to hold litigants in criminal contempt: "[a] court ... shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; ... (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 28 U.S.C. § 1927 authorizes the imposition of costs and fees upon counsel "who so multiplies the proceedings in any case unreasonably and vexatiously." Likewise, the Federal Rules of Civil Procedure include provisions authorizing courts to punish counsel for abuse in pleading and discovery. For instance, the following rules provide for the imposition of attorney's fees as a sanction: Fed.R.Civ.P. 11 (certification requirement for papers), 16(f) (pretrial conferences), 26(g) (certification requirement for discovery requests), 30(g) (oral deposition), 37 (sanctions for failure to cooperate with discovery), 56(g) (affidavits accompanying summary judgment motions). *See also Chambers v. NASCO, Inc.,* 501 U.S. 32, 42 n. 8, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1990). Although they differ by context, sanctioning mechanisms are similar in that they are all rooted in the same basic goals—protecting the court and the public from litigation which impedes the administration of justice.

Besides being aimed at redressing obstruction of justice, sanctioning mechanisms are also similar in that

> [i]n each instance, the sanctions are *punitive* in nature, *see Horn,* 29 F.3d at 765 n. 13 ("[C]ontempt ... continues to serve essentially 'the same purpose' as do sanctions imposed under the supervisory power.") (citation omitted), in that the court intends to penalize counsel for an earlier failure to conform to some threshold of professional conduct imposed by court order, statute or rule. *See, e.g., Peterson v. BMI Refractories,* 124 F.3d 1386, 1395 (11th Cir.1997) (noting that 28 U.S.C. § 1927 is "penal in nature"); *Cooper v. Salomon Bros.,* 1 F.3d 82, 85 (2d Cir.1993) ("Rule 11 sanctions are often punitive or aimed at deterrence."); *Hamilton v. Ford Motor Co.,* 636 F.2d 745, 747 (D.C.Cir.1980) ("The principal purpose of Rule 37(b) is punitive, not compensatory.").

deliberate and actually impedes the orderly litigation of the case,[111] to-wit: obstructs justice, the perpetrator could be cited for criminal contempt.[112]

## C.

As the district court stated in its February 23, 1998 order granting the defendants' motions for sanctions, the plaintiff and her lawyers "abused the judicial process" when they invoked the court's jurisdiction for the purposes of extorting a settlement from the defendants and, in the process, ruining the Nezhats' professional reputations. The defendants, of course, were aware of these purposes from the outset; the Nezhats, in particular, had been suffering the same abuse in Mullen's state court lawsuit. Unsure of what course to take to bring an end to the litigation, and thus the abuse, the defendants' lawyers turned to the court. After answering the plaintiff's complaint, they wrote a letter to the court describing their plight and suggesting that the court consider allowing them to conduct Rule 11 discovery to determine whether Byrne had conducted a pre-filing "inquiry reasonable under the circumstances" into the facts of the case, as required by Rule 11(b). In pursuing this course, defense counsel chose not to employ the tools provided by the Rules of Procedure, such as Rules 12(e) and (f), for stripping a complaint of bogus claims and scandalous allegations. The court, in turn, allowed itself to be guided by counsels' suggestion and similarly chose to allow the shotgun pleading to stand. Foregoing use of the tools provided by the Rules, the court granted the defendants

---

*Id.* In short, rules and procedures designed to redress obstruction of justice are "designed not only to protect participants in judicial proceedings but also to prevent miscarriages of justice." *United States v. Walasek,* 527 F.2d 676, 680 (3d Cir.1975).

[111]We note that to convict a person of criminal contempt, it is not necessary to establish "that the defendant harbored the specific purpose of obstructing the due administration of justice; all [that] has to [be] establish[ed] is that the defendant should have reasonably forseen that the natural and probable consequences of the success of his scheme would achieve precisely that result." *Silverman,* 745 F.2d at 1393. "An ordinary lawyer engaging in the conduct [the defendant] was charged with here would know [what] would come to pass [and that these consequences] would adversely impinge upon the due administration of justice." *Id.* at 1395.

[112]"In considering appropriate sanctions for attorney misconduct, the district court has an array of options, ranging from criminal contempt to non-contempt measures." *Kouri-Perez,* 187 F.3d at 8 (*citing Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 564 (3d Cir.1985) (noting that district judges have "a[ ] wide range of tools to promote efficiency in their courtrooms")). *See* note 115 (discussing procedural, disciplinary, and ethical rules, such as 18 U.S.C. § 401, 28 U.S.C. § 1927, Fed.R.Civ.P. 11, 16, 26, 30, 37, and 56, which codify aspects of the court's inherent power to address litigation abuses). Because its potency necessitates that it be used with restraint and discretion, there are often "sound grounds for not invoking the court's criminal-contempt power." *Kouri-Perez,* 187 F.3d at 8. "[T]here is much to be said for deploying the least extreme sanction reasonably calculated to achieve the appropriate punitive and deterrent purposes." *Id.* "[T]he criminal contempt power is to be reserved for conduct that bespeaks of criminal *mens rea* (i.e., intentional or reckless conduct) and has been proven beyond a reasonable doubt, whereas non-contempt sanctions usually suffice in circumstances involving 'less culpable states of mind.' " *Id.*

leave to discover whether Byrne had investigated the factual underpinnings of his claims as required by Rule 11.

D.

The importance of using the Rules to uncover bogus claims and defenses, thereby reducing the parties' dispute to its bare essentials, cannot be overemphasized.  As we have stated on several occasions over the past twelve years, if, in the face of a shotgun complaint, the defendant does not move the district court to require a more definite statement, the court, in the exercise of its inherent power, must intervene *sua sponte* and order a repleader.[113]  Implicit in such instruction is the notion that if the plaintiff fails to comply with the court's order—by filing a repleader with the same deficiency—the court should strike his pleading or, depending on the circumstances, dismiss his case and consider the imposition of monetary sanctions.[114]

District court intervention in this fashion accomplishes several objectives.  First, it conserves judicial and parajudicial resources and thereby benefits litigants standing in the queue waiting to be heard.[115]  Second, it curtails the need for satellite litigation under Rule 11, 28 U.S.C. § 1927, or the court's inherent power.

---

[113]Discharging this duty ensures that the issues get defined at the earliest stages of litigation.  The district court "should [strike] the complaint[ ] and instruct[ ] counsel to replead the[ ] case[ ]—if counsel could in good faith make the representations required by Fed.R.Civ.P. 11(b)." *Cramer v. Florida,* 117 F.3d 1258, 1263 (11th Cir.1997) citing *Ebrahimi v. City of Huntsville Bd. of Ed.,* 114 F.3d 162 (11th Cir.1997) (per curiam); *Cesnik v. Edgewood Baptist Church,* 88 F.3d 902, 905 (11th Cir.1996); *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.,* 77 F.3d 364, 366-67 (11th Cir.1996); *Pelletier v. Zweifel,* 921 F.2d 1465, 1517-18 (11th Cir.1991); *Fullman v. Graddick,* 739 F.2d 553, 557 (11th Cir.1984).

[114]The same duty to intervene *sua sponte* applies whether the court is faced with a shotgun complaint or a shotgun answer.

[115]In *Malguta v. Samples,* No. 00-12540 (11th Cir. July 13, 2001), a panel of this court reviewed a case exemplifying the waste of judicial resources shotgun pleadings are capable of producing.  Because the litigation and subsequent district court order dismissing the complaint pursuant to Fed.R.Civ.P. 12(b)(6) were spawned by a shotgun complaint, the panel declined to parse through the incoherent complaint to determine whether it stated a claim for relief.  Instead, taking its lead from our decision in *Cesnik v. Edgewood Baptist Church,* 88 F.3d 902, 910 (11th Cir.1996), the panel vacated the judgment and remanded the case to the district court with the instruction that it strike the complaint and require the plaintiff to replead his case.  The panel explained: "[w]e are unwilling to address and decide serious constitutional issues on the basis of this complaint.... [T]oleration of complaints such as this one 'does great disservice to the administration of civil justice' " (citing *Johnson Enter. v. FPL Group, Inc.,* 162 F.3d 1290, 1332 (11th Cir.1998)).

> After hearing oral argument and wading through the voluminous record in this case, our first thought was to return the case to the district court and instruct it to narrow the issues by ordering the plaintiff to redraft the complaint so that it conformed with the pleading requirements of Fed.R.Civ.P. 8 and 10.  However, given the vast resources the parties and the district court had invested in the case thus far, as well as the need to bring this bitter controversy to an end, we opted to perform this narrowing exercise ourselves and conclude this torturous case.

Third, it minimizes counsel's and his client's exposure to a criminal contempt citation. Fourth, it limits the potential for post-litigation tort actions for abuse of process or malicious prosecution.[116] Fifth, early *sua sponte* intervention—coupled with the imposition of punitive measures when the use of abusive litigation tactics is deliberate—operates as both a specific and a general deterrent. And, finally, early *sua sponte* intervention will ensure public confidence in the court's ability to administer civil justice.

V.

For the reasons we have stated, the imposition of monetary sanctions against Byrne is AFFIRMED; the court's dismissal of the claims against Northside and the claims against the Nezhats and the Center (except Count I which Manov voluntarily dismissed) is AFFIRMED; and the imposition of monetary sanctions against Manov is VACATED.

SO ORDERED.

---

[116]A district judge who tolerates shotgun pleading effectively leaves to the tort law the job of redressing the abuse. A suit for abuse of process or malicious prosecution may compensate the injured party. The tort law is not aimed, however, at redressing the injury to the court and the judicial system as a whole. While successful completion of a meritorious abuse of process or malicious prosecution claim is predicated on the misuse of the judicial system, these torts only vindicate the court's integrity indirectly. As such, they should not be viewed as a viable alternative to the court's inherent power or ability to impose sanctions under Rule 11. Unlike the tort law, these tools are aimed directly at redressing the harm suffered by the judicial system.